1    Burlington P.D. to your knowledge?

2        A.    Not to my knowledge.

3        Q.    Okay.

4              MR. CHADWICK:  Thank you, Pietro.

5              MR. LYNN:  Hey, listen, I'm always looking for

6    a way to work these things out without a problem.

7    BY MR. CHADWICK:

8        Q.    Okay.  So, Sergeant, I believe we concluded

9    the morning hour with you answering a question about

10   what information you had when you responded to the call

11   at What Ale's You; is that correct?

12       A.    That's correct, yes.

13       Q.    I believe, and just so I'm clear, your answer

14   was that you had received a report of a fight at·

15   What Ale's You; correct?

16       A.    I heard it over the radio dispatched to two

17   other officers.

18       Q.    Okay.  And you were on Battery Street,

19   somewhere on Battery Street, you believe, when you heard

20   that call come in; correct?

21       A.    Yes.

22       Q.    And then you immediately responded to the call

23   with your lights activated and your siren activated; is

24   that correct?

1  you're moving towards them or flat footed?
2       A.   Sorry.  You're saying that, like, are you
3  insinuating that I was running at them?  I mean, can you
4  clarify your question.
5       Q.   The video shows you moving towards them;
6  correct.
7       A.   Correct.
8       Q.   It doesn't show you stopping; correct?
9       A.   Correct.
10      Q.   It would be safe to say that when you pushed
11 Jeremie, you were still moving towards him; is that
12 correct?
13      A.   I believe I stopped when I made contact with
14 him.
15      Q.   You stopped when you made contact, not before.
16      A.   I believe so, yes.
17      Q.   Now, they were standing, I believe, next to
18 JP's Pub; is that correct?
19      A.   In that area, yes.
20      Q.   And it was within close proximity to the wall
21 of the building; is that correct?
22      A.   I mean, the building is there.  I'm not sure
23 how close they were.
24      Q.   Okay.  But you wouldn't deny that you pushed

1   him hard enough for him to fall into the wall; correct?

2       A.   I pushed him hard enough so that he stumbled
3   and tripped and fell backwards.

4       Q.   So you're calling this push a stumble and a
5   trip, not just him being thrown into a wall?

6       A.   I pushed him and he stepped backwards and
7   tripped and fell backwards.

8       Q.   Let's watch that. I'm going to start it back
9   at 55 seconds.

10              (Video playing.)

11  BY MR. CHADWICK:

12      Q.   So you're saying that that push gave him
13  enough time to stumble backwards, trip, and then fall
14  into the wall.

15      A.   Yes.

16      Q.   That's what you put in your police report.

17      A.   Yes.

18      Q.   That's what you told Mr. Burgess.

19      A.   Yes.

20      Q.   Is that actually what is shown on that video?

21      A.   I don't believe the video shows his feet.

22      Q.   It shows -- so in a matter of a second it
23  shows him standing and then flying into a brick wall.
24  Isn't that what the video shows?

1  Jeremie Meli into the wall there, would you have
2  arrested me?
3      A.   This is a hypothetical situation.  I don't
4  know exactly what you're trying to describe because your
5  words kind of conflagrating, and I don't know what that
6  means.
7      Q.   You reviewed it yesterday.
8      A.   Yes.
9      Q.   You're reviewing it now.
10     A.   Yes.
11     Q.   If this video was not of a police officer
12 pushing a young gentleman into a wall, if it was just a
13 citizen, if you watched that video, would you have
14 probable cause to charge that individual with an
15 assault?
16     A.   I can't answer that question because this is a
17 video of a police officer using a reasonable amount of
18 force.
19     Q.   You're claiming now that that was a reasonable
20 amount of force given what knowledge you had at that
21 moment.  You're saying that pushing someone into a wall,
22 knocking them unconscious was a reasonable amount of
23 force.
24     A.   I used a reasonable amount of force to try to

1  separate one male who was identified as assaulting
2  another male and appeared to be actively agitated,
3  yelling at, and about to assault another person.
4      Q.   But that's not what you said. What you said
5  was that you didn't really know who was responsible for
6  the fight at that point. You said --
7      MR. LYNN: You're arguing with him, Evan.
8  You're supposing to be asking questions about what he
9  saw, what he did, and why he did it. You're arguing.
10 You'll have that chance if you try the case.
11 BY MR. CHADWICK:
12     Q.   So I just want to be clear at this point,
13 Sergeant, that the information you had was that there
14 was a fight, a gentleman in a black shirt identified
15 another gentleman in a plaid shirt, that he had hit him
16 a couple of times. You had another gentleman in a black
17 shirt approaching that gentleman in a plaid and poking
18 him until the chest, and the gentleman in the plaid was
19 also pointing at that gentleman saying something that
20 you said you couldn't hear but the video says you
21 started a fight. So that was the totality of the
22 circumstances -- I just want to be clear -- before you
23 decided to use the force that you did.
24     A.   Is that a question or statement?

1    Q.    That is a question. That was the totality of
2    the circumstances.
3    A.    Is that I had information that one male had
4    assaulted another male and that male suspect was
5    actively arguing with an additional male and it appeared
6    like there was about to be another fight, yes, that is
7    the totality of the circumstances.
8    Q.    So you're saying that there was about to be
9    another fight.  Does that imply that it could have been
10   a mutual fight?
11   A.    It could have been, yes.
12   Q.    Why don't you push Sid?
13   A.    Because Mr. Meli appeared to be the aggressor
14   and had already been identified as assaulting another
15   person.
16   Q.    So you're saying Jeremie was the aggressor in
17   the situation with Sid?
18   A.    That's the way it appeared to me on scene,
19   yes, with the information that I had on at the time.
20   Q.    So the information was that Sid was following
21   him up the street poking him in the chest and yet you
22   determined that it was Jeremie who was the aggressor,
23   not Sid.
24   A.    Again, I didn't know that Sid had walked up