IN THE UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

ALBIN MELI;
CHARLIE MELI;
JEREMIE MELI;

     PLAINTIFFS

vs.

CITY OF BURLINGTON, VERMONT;          Civil Action
                                              No. 2:19-CV-71

BRANDON DEL POZO,
INDIVIDUALLY AND IN HIS OFFICIAL
CAPACITY AS CHIEF OF POLICE FOR
THE CITE OF BURLINGTON, VERMONT;

JASON BELLAVANCE,
INDIVIDUALLY AND IN HIS OFFICIAL
CAPACITY AS A POLICE OFFICER FOR
THE CITY OF BURLINGTON, VERMONT;

CORY CAMPBELL,
INDIVIDUALLY AND IN HIS OFFICIAL
CAPACITY AS A POLICE OFFICER FOR
THE CITY OF BURLINGTON, VERMONT;

     DEFENDANTS


**OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT**

     NOW COMES Plaintiffs, Albin Meli, Charlie Meli, and Jeremie Meli, by and through

their counsel, and objects to Defendants' Motion for Summary Judgement. In support of their

position, Plaintiffs state as follows:

**<ins>Factual History</ins>**

     Defendants are correct about one fact in their introduction, on September 9, 2018 the

Meli brothers were different figures than they are today. In the early morning hours of September

9th the Melis could not defend themselves against the intentional, deliberate, and malicious acts

of Sergeant Bellavance and the officers he commanded. However, nearly three years after the incident occured that forever changed their lives, after large protests on Battery Park, the resignation of former Chief Brandon Del Pozo, former Deputy Chief Jannine Wright, and former Sgt. Bellavance, they can.

On September 9th, 2018, the Meli brothers needed help from the Burlington Police Department. They were assaulted and unlawfully arrested instead. The Melis had been involved in a brief altercation at What Ales You, where they had been swarmed by both What Ales You staff and approximately six members of the UVM hockey team (*See Ex. 1, 50:8-12 and Ex. 2, 40:15-19*). The Melis had walked away. Sinan Eren, the owner of What Ales You, followed the Melis up the street. He was not afraid of them, he simply wanted to talk to them about what had happened (*See Ex. 3, 51:22-24*).

### Jeremie Meli

Sgt. Bellavance responded to a report from dispatch of a fight at What Ales You. He did not know who was involved, who the aggressor was, or what precipitated the argument (*See Ex. 5, 141:2-15*). Sgt. Bellavance exited his vehicle and approached Matthew Fay. Fay said he was hit "in the face a few times." Fay pointed up the street to Jeremie (*See Exhibit 6 at 0:30*). Fay was not bleeding, Sgt. Bellavance did not observe any injuries, and Fay did not appear to be in any distress (*See Ex. 6, at 0:30, and Ex. 5, 165:17-20*). Sgt. Bellavance walked up the street and first encountered Albin, who told Sgt. Bellavance that "nothing had happened" (*See Ex. 6 at 0:52*). Sgt. Bellavance ordered Albin to "take a seat," Albin complied by moving out of Sgt. Bellavance's way (*See Ex. 6 at 0:54*). Sgt. Bellavance walked past Albin.

At the same time, Eren follows Jeremie up the street and begins arguing with Jeremie. Eren repeatedly pokes Jeremie in the chest (*See Ex. 6 at 0:57*). Jeremie makes no contact with

Eren (*See Ex. 6 at 0:57*). As Sgt. Bellavance approaches, Jeremie states to Eren three times, "you guys started a fight" (*See Ex. 6 at 0:55*). Sgt. Bellavance ignores Jeremie's excited utterance regarding self defense, ignores the fact that Eren was the one making contact with Jeremie, and ignores the fact that there was an apparent dispute between parties about who started the altercation. Sgt.Bellavance acted as the judge, jury, and executioner as he arrived. Approaching with full momentum and without uttering a single word to either Jeremie or Eren, or taking a single measure to de-escalate, Sgt. Bellavance violently shoves Jeremie with two hands. The shove takes Jeremie, who has not seen Sgt.Bellavance approach, by surprise. Jeremie flies backwards defenseless, and strikes his head against the wall. The sickening sound of Jeremie's head striking the cement can clearly be heard on Sgt. Bellavance's body camera (*See Ex. 6 at 0:10-1:00*). The violent impact causes Jeremie to lose consciousness, his eyes roll back in his head and his entire body goes limp (*see Ex. 6 at 0:58-1:06*).

Eren described Sgt. Bellavance's actions as an assault (*See Ex. 3, 56:2-3)*. Nathan Bradbury, an objective by-stander, who happened to be on the sidewalk at the time of Sgt. Bellavance's shove, called it an attack, "…he attacked Jeremie. Like he wasn't trying to arrest him. He wasn't-- He attacked him" (*See Ex. 7, 21:18-21*) .  Kelly Wassick, who was also on the scene, told Officer Schmidt, "I'm not gonna lie, they smashed his head against that wall" (*See Ex. 21, at 2:38*).  Even Sgt. Bellavance acknowledged that his shove was "meaningful" (*See Ex. 5, 199:13-16*). Bradbury and Eren both confirm that Sgt. Bellavance said nothing to either Jeremie or Eren prior to pushing Jeremie (*See Ex. 3, 53:3-9; see Ex. 7, 34:13-21*).  Eren further states that he did not notice Sgt. Bellavance approach until he had made contact with Jeremie (*See Ex. 3, 38:21-25*).

Officer Schaller, who arrives on scene shortly after Sgt. Bellavance, places her knee on Jeremie's upper back/neck area as she assists Sgt. Bellavance in handcuffing Jeremie (*See Ex. 6 at 1:37*).  Officer Ross arrives shortly thereafter and takes control of Jeremie's legs.  Officer Ross can be heard threatening Jeremie as he lay on the ground, "Stop, if you kick me, you're gonna get fucking tased" (*See Ex. 6 at 2:51*).  Throughout this interaction, none of the officers identify themselves as law enforcement to Jeremie, as he lies face down on the pavement disoriented and clearly in distress (*See Ex. 6 at 0:00-2:00 and Ex. 8 at 0:11-1:18* ).

Jeremie falls in and out of consciousness (*See Ex. 6 at 6:24; See Ex. 8 at 4:24*).  Officer Schaller is requested to confirm that Jeremie is still breathing (*See Ex. 8 at 5:14*).  Jeremie can be seen vomiting a pinkish substance (*See Ex. 8 at 4:24 and Ex. 23*).  Jeremie is eventually taken into custody and brought to the Emergency Room. He is evaluated for approximately 13 minutes (*See Ex. 8 at 54:10*) and then transported to the Chittenden County Correctional Facility, where he is lodged until the next day (*See Ex. 9 and Ex. 13, 115:25-116:-2*).

Jeremie was charged with simple assault, disorderly conduct, and resisting arrest (*Ex. 10*). All charges against him were dismissed by the Chittenden State's Attorney's Office. (*See Ex. 11*)

Defendants wish to paint Sgt. Bellavance as a hero, swooping in to save Eren from imminent harm. The video, which Defendants do not cite once in their motion, and the statements of all witnesses on the scene, show a completely different story. Sgt. Bellavance ignored all of his training and common sense, and violently assaulted Jeremie, without giving him any chance to comply. This assault resulted in Jeremie suffering a traumatic brain injury and PTSD (*Ex. 38, Dr. Tina Trudell,  Page 21 and Ex. 12, Dr. Andrew Haig, 64:4-13*).

**Albin Meli**

Albin tried to be the peacemaker on the night of the incident. He separated Jeremie from the bar staff and the hockey players and told them that he was taking Jeremie outside (*See Ex. 13, 81:2-24*). According to witness Sam Messenger, the hockey players outnumbered the Meli party by at least two to one (*See Ex. 1, 50:8-16*). Albin leaves the bar with Jeremie and Kelly Wassick and begins walking up Main Street.

Albin, who is standing just feet away from Jeremie when he is assaulted by Sgt. Bellavance becomes distressed as his brother's body lay limp on the sidewalk.  Albin continuously cries out to Sgt. Bellavance to help his brother, saying, "Sir, he is not responsive" (*See Ex. 6 at 1:12*).  As Jeremie lies motionless on the ground, Albin thinks his brother is dead (*See Ex. 13, 112:14-16*).

Officer Campbell arrives on scene and begins to speak with Albin (*See Ex. 14, at 0:41*) . Ofc. Campbell asks Albin to identify himself, Albin complies (*See Ex. 14, at 1:19*). Ofc. Campbell asks for Albin's driver's license, Albin complies (*See Ex. 14, at 1:29*). Albin, in tears, as he witnesses several officers on top of Jeremie, asks Ofc. Campbell "can you please tell them to stop" (*See Ex. 14, at 2:35*). In the process, trying to get Ofc. Campbell to pay attention to his brother, who is laying on the ground behind Ofc. Campbell, Albin places his hand on Ofc. Campbell's shoulder  (See Ex. 30). Sgt. Bellavance, who was standing behind Ofc. Campbell at the time, but who had only seen a part of the interaction between Ofc. Campbell and Albin, rushes in. Sgt. Bellavance, Ofc. Campbell, and other officers take Albin to the ground (*See Exhibit 6 at 5:05*). During the process of handcuffing Albin, he cries out in pain telling the officers to "please stop, you're hurting my hand" to which Ofc. Campbell responds, "yes" (*See Ex. 14 at 3:03*).

Del Pozo, in his internal review letter (*Ex. 30*) states that Sgt. Bellavance's interactions with Albin should have been done differently. "Affirmative command of the scene, including letting officers know that the man had just seem[sic] his brother hit his head against the ground and go unconscious, may have obviated the perception that he was a needless threat to officer safety who should be placed under arrest." (*See Ex. 30*)

Defendants state numerous times that Albin ignored verbal commands from Ofc. Campbell and Sgt. Bellavance. This is incorrect. The only verbal commands given, when Albin is interacting with Ofc. Campbell, were directed at Nathan Bradbury, who is standing next to Albin (*See Ex. 14 at 2:28; see Ex. 7, 31:20-25*).

Albin was arrested by Ofc. Campbell.  On the way to the police station, Ofc. Campbell states, over his radio, that he is going to charge Albin with disorderly conduct and impeding an officer:

> "Unidentified officer:  I have enough for simple assault for your guy, based on what happened before we got here. I don't know if he picked up any additional charges with you or not.
>
> Campbell:  My male has D.C. and impeding, I'm not sure how he's involved with assault."

(*See Ex. 14, at 14:38*).  When Albin is issued a citation, it reads that he is being charged with "Simple Assault/ D.C./ Impeding a Police officer" a felony with a three year maximum sentence (*See Ex. 15*).  Nowhere throughout this interaction does Ofc. Campbell mention to Albin that he was being charged with assault on law enforcement.

One day later, when Ofc. Campbell finalizes his Affidavit of Probable Cause (*Ex. 24*), he determines that Albin has also committed an assault on a Law Enforcement Officer. Sgt.

Bellavance notarizes this affidavit (*See Ex. 25, 23:12-14*). It is customary that the supervising officer, in this case Sgt. Bellavance, approves Ofc. Campbell's affidavits of probable cause prior to submitting them to the State's Attorney for prosecution (*See Ex. 25, 23:18-20*).

This discrepancy shows clearly that on the night of the incident, Campbell did not believe he was assaulted by Albin. However, one day later after he conferred with Sgt. Bellavance did the assault on a law enforcement officer charge appear. (*See Ex. 13*).

### Charlie Meli

Charlie Meli stood close by, upset from what was happening to his two brothers. Charlie was not aggressive, only emotional. He spoke with officers about what he saw (*See Ex. 22, at 0:30-2:04, and 2:33-2:40*).

The Burlington Police Department had previously been provided with clear guidance by Jay Diaz, attorney for the ACLU, on a citizen's right to voice an objection to police conduct (*Ex. 26*). Del Pozo acknowledged that he had received the Diaz letter regarding the fact that the arrest of black individuals for voicing objection to police conduct was a violation of their constitutional right to free speech (*See Ex. 19, 54:6-55:8*). Although Del Pozo acknowledged the ACLU allegation that black people were being disproportionately charged with disorderly conduct for exercising their First Amendment right, Del Pozo could not point to any specific training he gave his officers on the subject (*See Ex. 19, 58:3-6*).

Sgt. Bellavance further aggravated this deliberate indifference to Charlie's constitutional rights by encouraging his subordinate officer, who had planned on releasing Charlie (*See Ex. 21 at and 8:25-8:45*), to charge Charlie with "at least disorderly… or impeding" (*See Ex. 22 at 6:00-6:55*). Sgt. Bellavance issued this order despite having no interaction with Charlie, "I'm not sure who actually made the decision to put cuffs on this guy… I didn't see that part…" (*See Ex.*

*22 at 6:48*).  As shown in *Ex. 26*, the constitutional violations of the Burlington Police

Department disproportionately impact people of color.  Charlie was unlawfully arrested for

Disorderly Conduct and transported to Chittenden County Correctional Facility.

All charges brought by the Burlington Police Department against Charlie were dismissed

by the Chittenden County State's Attorney's Office (*See Ex. 27*).

<strong>Burlington Police Department's Response</strong>

Nathan Bradbury left Main Street after the incident and immediately calls his mother and

texts his friend (*See Ex. 7, 33:12-19*).  He did this so they could confirm his state of mind should

it come into question at a later time (*See Ex. 7, 33:21-23*).  Bradbury also files an online citizen

complaint on September 9, 2018 where he spells out what he had witnessed (*See Ex. 7, 24:9-10*).

On September 25, 2018, Bradbury provides an affidavit to Plaintiffs' Counsel (*Ex. 28*).

At the time of his statement, no one from the Burlington Police Department had reached out to

him regarding his citizen complaint (*See Ex. 7, 23:21-22*).

The Burlington Police Department officially opened an internal investigation into the

actions of Sgt. Bellavance and Ofc. Campbell on or about November 2nd, 2018 (*See Ex. 29*).

However, Del Pozo acknowledged that he knew he needed to begin an investigation upon

receiving Sgt. Bellavance's email that he sent shortly after the incident (*See Ex. 19, 63:20-64:5*).

After interviewing witnesses and observing body camera footage, Chief del Pozo

concluded that Sgt. Bellavance's use of force on Jeremie was "unnecessary" and "<u>unreasonably</u>

departed from training" (emphasis added). Del Pozo states in his letter that the department

concluded Sgt. Bellavance did not have sufficient cause to use "this level of force on Meli given

your training and the prevailing circumstances. Meli was not involved in an active physical

altercation with the other person, he was not fleeing the scene, and there was no imminent

physical danger to you or other persons based on either of the men using or threatening physical force against each other." (*See Ex. 30*).

Del Pozo listed a total of 8 de-escalation techniques Sgt. Bellavance should have used before resorting to force (*See Ex. 30*).

Chief Del Pozo suspended Sgt. Bellavance for 4 days, one day per work week, without pay.  In determining an appropriate suspension, Chief del Pozo pointed to the prior suspension of Officer Rabideau, who was accused of intentionally dropping a handcuffed prisoner on his face and was suspended for one day (*See Ex. 19, 124:17-24*).  The Bellavance suspension was the longest suspension administered for a use of force incident and was the second longest del Pozo ever administered for any misconduct (*See Ex. 19, 124:17-127:17*).

Del Pozo defines excessive use of force as "... there's cause to believe that there are options that the officer could have safely exercised that could have precluded the need for force" (*See Ex. 19, 116:13-20*). Defendant's own use of force expert, Jack Ryan, and Officer Erica Schaller, a 13 year veteran of the Burlington Police Department, both also define excessive force as force that is unnecessary (*See Ex. 39, 15:6-8, See Ex. 16, 19:19-22 and 5:18*).

On September 21, 2020 the City of Burlington reached a severance agreement with Sgt. Bellavance. The city agreed to pay Sgt. Bellavance $300,000 for him to leave the department stating that Sgt. Bellavance did not use available de-escalation techniques and used unnecessary force (*See Ex. 17, 2:33 and 1:13-15*). Mayor Miro Weinberger stated in his press release that Sgt. Bellavance "...should be held to a higher standard as a leader in the department." (*See Ex. 18*).

Following Chief del Pozo's condemnation, his suspension and later severance from the department, Sgt. Bellavance still offers no remorse for his assault on Jeremie. When Sgt. Bellavance was asked directly, "Sergeant, are you sorry for what you did to Jeremie" he

proffered no apology. Further, with 20/20 hindsight vision, Sgt. Bellavance stated he would not have done anything different to avoid assaulting and causing serious injury to Jeremie. (*See Ex. 5, 232:7-19*).

<u>**Racial Animus**</u>

**The City of Burlington Knew of Brandon Del Pozo's Support of Racial Profiling Prior to Hiring Him**

"A further implication is that if the police are patrolling such areas populated by a mix of white and black citizens, the sub-group of blacks among them contains significantly more criminals." (*Ex. 49 at p. 279, paragraph 3*)

"Regardless of the method employed, these findings suggest that racial profiling… offers utility as a police policy." (*Ex. 49 at p. 282, paragraph 5*)

"... prohibiting racial profiling will cause racist officers to instead hide their racism in elaborate disguises." (*Ex. 49 at p. 287, paragraph 2*)

In 2001 Brandon del Pozo wrote an article supporting racial profiling as a useful tactic. (*See Ex. 49*). In this article, del Pozo points to the works of white supremisist, Jared Taylor, in support of his position. The city of Burlington knew of this article prior to hiring del Pozo as their police chief, yet, despite the concerns voiced (*Ex. 50)*, they elected to hire him anyway.

Unfortunately, but not surprisingly, the force used in the Meli incident is not isolated. For years, people of color have faced disproportionate use of force employed by the Burlington Police Department. UVM professor of economics, Stephanie Seguino has released several statistical based reports analyzing Burlington Police Department's traffic stop data. Professor Seguino has found that the data analyzed in traffic stops can be connected to use of force data as it shows the disparate treatment that people of color endure from Burlington Police officers (*See*

*Ex. 36, 55:6-12*).  Seguino's data shows that although blacks make up only 5.5 percent of Burlington's population between 2016 and 2017, they are disproportionately issued more tickets, their vehicles were searched more often, and they were arrested more often than whites despite officers finding less contraband when compared to whites (*See Ex. 37*).

A review of the City's own data goes further to support the disparate treatment of blacks. A 2019 report on use of force showed that 20.9% of the total use of force incidents reported involved black people and that 39% of all incidents where a firearm was pointed involved a black individual (*See Ex. 34*). This is despite blacks only making up 5.7% of the City's population according to US Census data recorded for 2019 (*See Ex. 35*).

Sgt. Bellavance's use of force numbers go even further in the wrong direction.  Sgt. Bellavance was found to have used force 55 times throughout his career with the Burlington Police Department.  Of these, 25 percent of the use of force incidents were used on blacks.  (*See Ex. 47*).

Sgt. Bellavance's use of force reports show an even more troubling trend; that he uses verbal commands before responding with force less against blacks than any other race. (*See Ex. 47*).

A jury would not need to rely on the statistics alone, as it could compare the Meli case and the case of Mabior Jok with that of John Brayshaw to see for themselves the disparate response of Sgt.Bellavance when dealing with men of color as opposed to whites.

**Mabior Jok**

Less than 24 hours prior to the Meli incident, Mabior Jok, a Sudanese refugee, was on Main St. in nearly the same location as the Melis were. Officer Corrow approached Mabior from behind and, without giving any verbal commands, grabbed Mabior and slammed his face into the

pavement (*See Ex. 31 and Ex. 32*). Sgt. Bellavance arrived a short time later, where he can be seen interacting with both white and black witnesses. The video shows Sgt. Bellavance speaking in a conversational tone with white witnesses, while he is aggressive and physical with the black witness (*See Ex. 33, at 3:48 through 4:30*).

### John Brayshaw

Compare the cases of Jok and Meli, with that of John Brayshaw (*Docket No. 513-cv-253*). In Brayshaw, Sgt. Bellavance encountered a loud and reportedly aggressive acting white male on Church Street. Sgt. Bellavance used several deescalation techniques including officer presence, verbal commands, and escorting Brayshaw away before using force to counter Brayshaw's resistance.

The case of Brayshaw was dismissed by Judge Christina Reiss on the Defendant's motion for summary judgement. Judge Reiss found Sgt. Bellavance's use of force to be reasonable where he had first used verbal commands and then minimal force by escorting Brayshaw away from a group of individuals and, only after Brayshaw resisted, used an arm bar take down to effect an arrest (See *Brayshaw v. City of Burlington*, Case No. 5:13-cv-253 D. Vt. 2015, Page 19). It was also admitted by Sgt. Bellavance that, prior to Brayshaw's resistance that resulted in use of force, he had not intended to arrest Brayshaw for disorderly conduct (*Brayshaw* at Page 19). This disparate treatment between an aggressive white man who ignored Sgt. Bellavance's orders, versus the Melis and Jok who were not resisting, goes to the heart of Plaintiffs' racial animus and failure to train claims.

### Fake Social Media Attacks

Seguino's reports were the basis of online attacks from a Lorie Spicer, who criticized the work of Seguino as not being peer reviewed (*See Ex. 40*). Another account, Abby Sykes, went on

to attack the racial makeup of the police oversight commission stating on June 25th, 2019 "The commission is now 6/7th black. Is this representative of the Burlington community?" (*See Ex. 41*). It was later revealed that both Lorie Spicer and Abby Sykes were in fact Deputy Chief Jannine Wright who, with Chief del Pozo's knowledge, created the fake social media accounts (*See Ex. 46, 35:14-15*).

Not only was Wright's social media activity known by Chief del Pozo, he actively participated in it himself, posting his own messages under Wright's fake accounts as well as creating his own fake account under the name "Winkle Watchers" (*See Ex. 19, 137:16-23, and Ex. 20, 65:6-12 and 66:4-10*). Given the racist nature of the Sykes post, questioning whether blacks could represent the greater Burlington community when it comes to police reform, and both Wright and del Pozo's acknowledgement that some of the posts were deleted and could not be recovered (*See Ex. 46, 65:13-19*), a jury could infer through a negative inference instruction that additional racist posts existed. [1]

What is most troubling about the social media scandal is that even the Mayor had knowledge of it while it was happening, yet did nothing about it until confronted by the media five months later (*See Ex. 42*). Del Pozo furthered the coverup when asked about it in interrogatories in both the Meli and Jok case, denying the existence of the accounts under oath even after Deputy Chief Jannine Wright made it clear that he needed to disclose (*See Ex. 20, 58:19-24*).

This activity further supports the Plaintiff's claim that the Burlington Police Department, led by Chief del Pozo, facilitated an atmosphere of racial bias, which trickled down to its patrol officers when interacting with people of color on the street which significantly contributed to the injuries suffered by Plaintiffs.

---

[1] Plaintiffs filed their complaint on May 2, 2019.

**Legal Memorandum**

**Standard of Review**

The grant of a motion to dismiss pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure is a ruling of law which we review de novo. *Austern v. Chicago Bd. Options Exchange, Inc.*, 898 F.2d 882, 885 (2d Cir.), cert. denied, 498 U.S. 850, 111 S.Ct. 141, 112 L.Ed.2d 107 (1990). In deciding such a motion, a district court must construe any well-pleaded factual allegations in the complaint in favor of the plaintiff, and may dismiss the complaint only where "`it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Allen v. Westpoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir.1991) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 101-102, 2 L.Ed.2d 80 (1957)). *This caution applies with greater force where* the complaint is submitted pro se or *the plaintiff alleges civil rights violations*. *Easton v. Sundram*, 947 F.2d 1011, 1015 (2d Cir.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992).

(emphasis added) *Sykes v. James*, 13 F. 3d 515 (2d Cir. 1993).

Qualified Immunity cannot be properly viewed as a question of law in the face of serious factual disputes.

[W]e have held that when 'the factual record is not in serious dispute . . .[,] [t]he ultimate legal determination whether . . . a reasonable police officer should have known he acted unlawfully is a question of law better left for the court to decide.' *Warren v. Dwyer*, 906 F.2d 70, 76 (2nd Cir.), cert. denied, 498 U.S. 967, 111 S.Ct. 431, 112 L.Ed.2d 414 (1990); see also *Oliveira v. Mayer*, 23 F.3d 642, 649 (2d Cir.1994), cert. denied, ___ U.S. ___, 115 S.Ct. 721, 130 L.Ed.2d 627 (1995) ("[I]mmunity ordinarily should be decided by the court ... in those cases where the facts concerning the availability of the defense are undisputed.") (citations and internal quotation marks omitted); *Finnegan v. Fountain*, 915 F.2d 817, 821 (2d Cir.1990) ("Once disputed factual issues are resolved, the application of qualified immunity is ... ultimately a question of law for the court to decide.").

*Lennon v. Miller*, 66 F. 3d 416, 421 2d Cir. (1995).

Should the Court find substantial differences between the parties factual renditions of the events and facts surrounding the Officer's use of force, respectfully the court must then halt its analysis and deny the defendant's qualified immunity argument. "The parties' versions of the material facts differ markedly on these issues. See Plaintiff's Statement of Disputed Material

Facts. These differences also preclude summary judgment on the defense of qualified immunity." *Breen v. Garrison*, 169 F. 3d 152, 153 (2nd Cir. 1999) referencing *Hemphill v. Schott*, 141 F.3d 412, 418 (2nd Cir.1998).

As to the standard of review for both the qualified immunity defense as well as the motion for summary judgement as to all of Plaintiff's other claims, "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2nd Cir. 1996).

> "In the fact finding process a trier is authorized to draw reasonable inferences from known or proven facts. But the inference, to qualify as a fact found, must be reasonable, and, in the context of the known facts, be one that springs readily and logically to mind and is not one of two or more inferences, both or all of which are about equally probable."

*Frankel v. Slotkin*, 984 F.2d 1328, 1335 (2nd Cir. 1993)

"[A]n inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact [that is known to exist]." *Siewe v. Gonzales*, 480 F.3d 160, 168 (2d Cir. 2007) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2nd Cir. 1998)).

## Argument

### Defendants Have Admitted that Sgt. Bellavance Used Excessive Force

Defendants have acknowledged that Sgt. Bellavance; 1) did not have sufficient cause to use the level of force; 2) Jeremie was not actively in a physical altercation; 3) Jeremie was not fleeing the scene; 4) there was no imminent danger to Sgt. Bellavance, Sinan Eren, or any other persons. *(See Ex. 30)*. Under the test set forth in *Graham v. Connor*, a reasonable jury could conclude that Defendants actions in disciplining, and eventually negotiating Sgt. Bellavance's departure serve as an admission that Sgt. Bellavance's actions were unlawful.

> Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," Bell v. Wolfish, 441 U. S. 520,  441 U. S. 559 (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

*Graham v. Connor* 490 U.S. 386 (1989).

### Even Standing Alone Sgt. Bellavance's Actions Constitute Excessive Use of Force

Sgt. Bellavance's actions are not nearly so benign as framed by Defendants. First, Defendant's appear to imply the existence of per se rule that the use of force in effecting an arrest is always permissible at any stage and in any circumstance. This is not correct, there is no "per se rule that an arrestee's refusal to submit to the easy application of handcuffs always permitted police officers to use substantial force...." *Brown v. City of New York*, 798 F. 3d 94, 102 2nd Cir. (2015). Here there was not even an instruction issued by Sgt. Bellavance before he shoved Jeremie into a brick wall.

Shoving, pushing, pulling, yanking, and throwing may all constitute excessive force in the 2nd Circuit. See *Maxwell v. City of New York*, 272 F.Supp.2d 285, 306 (S.D.N.Y.2003), *Robison v. Via*, 821 F. 2d 913, 924 (2d Cir. 1987), *Bellows v. Dainack*, 555 F.2d 1105, 1106 & n. 1 (2d Cir. 1977). The shove by Sgt. Bellavance was described by Nathan Bradbury as premeditated, not a spur of the moment reaction, "He gathered momentum over two full strides and aggressively shoved Jeremy (sic) in the chest with both hands" (*See Ex. 28*). Kelly Wassic also stated, "...they smashed his head against that wall" (*See Ex. 21, at 2:38*). "[I]f there is a dispute concerning the amount of force used and the reasonableness of the force used, the matter becomes a question of fact for a jury to decide." *Allison v. Farrell,* No. 97 Civ. 2247, 2002 WL 88380, at *5 (S.D.N.Y. Jan. 22, 2002).

Defendant's cite to *Saucier v. Katz* for the proposition that a shove is not excessive force but neglect noting that the factual circumstances of that matter differ significantly from the case at hand. In *Saucier*, there were safety concerns regarding the Vice President and Plaintiff was not injured. Here, a bartender was pursuing and continuing a confrontation with Plaintiff who was retreating. Further, Jeremie suffered a serious brain injury as a result of Sgt. Bellavance's assault. (*See Ex. 38, Dr. Tina Trudell,  Page 21*)

Due to the factual dispute as to the amount of force that Sgt. Bellavance used, this factual determination is important to resolving whether qualified immunity could possibly attach. This isn't the only factual issue for Defendants' motion, the internal inconsistencies between Sgt. Bellavance's body camera (See Ex. 6) and his report (See Ex. 48) and his rendition of facts make the issue of qualified immunity unresolvable at the pleading stage. For example, Sgt. Bellavance states in his report that Jeremie "stumbled back a step," tripped, and then fell backwards which resulted in him hitting his head against a wall. Sgt.Bellavance uses a series of words to minimize the role he played in causing Jeremie's injuries. The reality is that Sgt. Bellavance plainly shoved Jeremie with violent and unnecessary force directly into a wall and his head smashed against the concrete as a result of the shove. A reasonable jury could disagree with Sgt. Bellavance's affidavit about critical details of the encounter, specifically that Jeremie stumbled after the "push" and lost his footing, as well as who the aggressive party was when Sgt. Bellavance arrived. In the face of these contradictory facts, the jury could reasonably conclude that Sgt. Bellavance is not credible. The jury could then discount his statements about why he took the actions he did as mere pretext and that a reasonable Officer would not perceive events as Sgt. Bellavance claims he did.

## Sgt. Bellavance  Is Not Entitled to Immunity

Sgt. Bellavance's use of force was not reasonable under the circumstances and case law as of September 9th 2018 establishes that Sgt. Bellavance violated clearly established constitutional rights. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

Jeremie had a right to explain himself, a right to be treated with dignity and a right to be free from suffering a brain injury simply because he was involved in a verbal dispute. Sgt. Bellavance ignored this right when he assaulted Jeremie.

### Sgt. Bellavance Lacked Probable Cause to Detain Jeremie Meli

Under any analysis Sgt. Bellavance's actions were unreasonable. "An officer's actions are objectively unreasonable when no officer of reasonable competence could have made the same choice in similar circumstances." See *Malley*, 475 U.S. at 341, 106 S.Ct. at 1096 (1986); citing *Lennon v. Miller*, 66 F. 3d 416 2nd Cir. (1995)

Here, the City of Burlington after internal review, sanctioned Sgt. Bellavance for his conduct in this matter (*See Ex. 17*). Additionally, former Chief del Pozo stated the use of force was unnecessary and unreasonable, and he was disciplined accordingly (*See Ex. 30*). *Breen v. Garrison*, 169 F. 3d 152 (2nd Cir. 1999) holds that it is for the jury to "determine the amount of force used, the injuries suffered and the objective reasonableness of the officer's conduct." *Id* at 153. Even if the Court draws inferences which credit Sgt. Bellavance with knowledge that it was possible Jeremie would not instantly submit the moment Sgt. Bellavance placed him under arrest, his actions still prevent him from receiving the benefit of qualified immunity. According to the 2nd Circuit, "The officers could be entitled to a summary judgment only if there existed a

per se rule that an arrestee's refusal to submit to the easy application of handcuffs always permitted police officers to use substantial force, including taking a person to the ground and incapacitating her with pepper spray, to accomplish handcuffing." *Brown v. City of New York*, 798 F. 3d 94, 102 2nd Cir. (2015).

Plaintiffs' rendition of events and evidence when contrasted with Defendant's Statement of Undisputed Material Facts places the three factors to be considered in any excessive force case in Plaintiff's favor: "...(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Tracy v. Freshwater*, 623 F. 3d 90, 96 (2nd Cir. 2010); see also *Graham v. Connor*, 490 US 386 (1989).

Comparing the facts to the standard here (1) Sgt. Bellavance was investigating a misdemeanor, (2) Plaintiff was not armed and was retreating from an aggressor, (3) Plaintiff was not aware of Sgt. Bellavance's presence and was never given an instruction by him.

Other courts have been very clear in their analysis of the question before this court. "The use of gratuitous force when a suspect is not resisting arrest violates the Fourth Amendment." *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008).

**Sgt. Bellavance's Actions Constitute Intentional Infliction of Emotional Distress**

Sgt. Bellavance inflicting a serious bodily injury on Plaintiff, resulting in a TBI, with no warning or instruction, where the complaining witness showed no injury and Plaintiff was in retreat being pursued by an aggressive third party (*See Ex. 6 at 1:06*) is well beyond any reasonable bounds. This behavior by a sworn law enforcement officer, willfully injuring a person simply because he can, exceeds the bounds of decent society.  See *Baptie v. Bruno,* 88 A.3d 1212 VT (2013).

The prerequisites for establishing a claim differ according to whether plaintiff suffered a physical impact from an external force. See *Kingston Square Tenants Ass'n v. Tuskegee Gardens, Ltd.,* 792 F.Supp. 1566, 1576-77 (S.D. Fla.1992). If there has been an impact, plaintiff may recover for emotional distress stemming from the incident during which the impact occurred. See *id.* " *Brueckner v. Norwich University*, 730 A. 2d 1086 VT (1999) at 1092.

Were the jury to believe Bradbury, Eren, and Wassick's testimony, classifying Sgt. Bellavance's acts as intentional (*See Ex. 28*) and an assault (*See Ex. 7, 21:18-21*) it could conclude that the criminal acts exceeded all bounds of decent society. In sum, decent society does not condone law enforcement perpetrating violent crime on the citizens they are entrusted to protect.

Sgt. Bellavance's assault on Jeremie was "meaningful" (*See Ex. 5, 199:13-16*) and the end result should not have surprised him.  The damages resulting from Sgt. Bellavance's assault continue to this day.

**Sgt. Bellavance Committed Battery Against Plaintiff**

Sgt. Bellavance does not enjoy qualified immunity for his blindside shove of Jeremie into a brick wall. As to the distinction between discretionary acts and ministerial acts, using excessive force does not fall under the ambit of discretionary acts. It would be reasonable for a jury to find for Plaintiff on this count against Sgt. Bellavance.

The Vermont Supreme Court defined battery as "...an intentional act that results in harmful contact with another." *Christman v. Davis*, 889 A.2d 746, 2005 VT 119 (Vt. 2005) citing Restatement (Second)  of Torts §13. It is undisputed that Sgt. Bellavance intentionally shoved Jeremie and it resulted in a harmful contact.  A reasonable  jury could agree with both Eren and

Bradbury's statements (*See Ex. 28 and Ex. 3, 56:2-3*) that Sgt. Bellavance assaulted Jeremie and therefore Sgt. Bellavance committed the intentional act of battery on Jeremie.

#### Sgt. Bellavance Actions Constitute Gross Negligence

Sgt. Bellavance's acts injuring Jeremie without taking any measures to deescalate constitute gross negligence.

> Under Vermont law, gross negligence requires the usual negligence elements: duty, breach, causation, and damages. Powers v. Office of Child Support, 173 Vt. 390, 795 A.2d 1259, 1265 (2002). In showing breach, a plaintiff must provide "facts that demonstrate that an individual defendant heedlessly and palpably violated a legal duty owed to plaintiff." Id. at 126 (citing *Mellin v. Flood Brook Union Sch. Dist.*, 173 Vt. 202, 790 A.2d 408, 423 (2001)).

*Fortunati v. Campagne*, 681 F. Supp.2d 528 (D. Vt. 2009).

Sgt. Bellavance reasonably should have known that his actions in shoving Jeremie forcefully into a brick wall would result in serious bodily injury or death and, despite this knowledge, Sgt. Bellavance proceeded to engage in the dangerous act of assaulting Jeremie that ultimately resulted in Jeremie suffering a traumatic brain injury (*See Ex. 12, 47:2-9)*.  Since "[g]ross negligence is usually a question for the jury…" *Id* at 545, Sgt. Bellavance is not entitled to summary judgement. The numerous witness statements (*Ex. 3, 56:2-3, Ex. 28, Ex. 7, 21:18-21 and Ex. 21 at 2:38*) and the video provide a genuine issue of material fact that only a jury can resolve on Jeremie's Gross Negligence count against Sgt. Bellavance.

#### Dismissal of State Law Claims is Similarly Improper

While the 42 USC 1983 claims against Sgt. Bellavance preclude the City of Burlington from Respondeat Superior liability, Jeremie's state law claims face no such restriction.

> To establish that a servant's conduct falls within the scope of his or her employment, a plaintiff must demonstrate that the conduct:
> > (a) ... is of the kind the servant is employed to perform; (b) ... occurs substantially within the authorized time and space limits; (c) ... is actuated, at least in part, by a

> purpose to serve the master; and (d) in a case in which force is intentionally used by the servant against another ... is not unexpectable by the master.
>
> *Id*.; *Sweet v. Roy*, 173 Vt. 418, 430-31, 801 A.2d 694, 703-04 (2002). The conduct of an employee falls outside the scope of employment if it is "different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master. Restatement (Second) of Agency § 228(2); *Sweet*, 173 Vt. at 431, 801 A.2d at 704.

*Doe v. Forrest*, 853 A. 2d 48, 54-55 VT (2004).

As *Doe* makes clear, it is Sgt. Bellavance's apparent authority as a Law Enforcement Officer which enabled him to commit the tortious act. It cannot be reasonably and logically inferred that a Police Officer employing excessive force is acting within the scope of employment.

According to State law, to hold Sgt. Bellavance personally liable and not merely his employer, the Plaintiff must show "that a law enforcement officer acting within the scope of the officer's duties either acted with bad faith or knew or should have known that those actions violated clearly established law." *Zullo v. State*, 205 A. 3d 466, 472 VT (2019). [2]

"Good or bad faith is a state of mind, *Brown*, supra, 314 F.2d at 679, provable by circumstantial as well as direct evidence." *Myers v. Ambassador Ins. Co., Inc.*, 508 A.2d 689, 691 (1986) citing *Johnson v. Hardware Mut. Cas. Co.*, 109 Vt. 481, 494 (1938). Additionally, the state law claims "bad faith,...may take the form of discriminatory animus." *Zullo* at 503.

As to the State Law claims, Plaintiff has provided a genuine issue of material fact that Sgt. Bellavance acted in bad faith and that it was fueled by racial animus (*See Ex. 6, and Ex. 37*).

### Summary Judgement for the City of Burlington is Improper

Defendants recite Plaintiff's claims against the various actors but Plaintiff would note that the Fourteenth Amendment claim against the City of Burlington is not so narrow as to focus

---

[2] Dr. Seguino's racial disparity research is relied upon by the Court in Zullo in their analysis of State Law claims.

solely on the City's use of force policy.  Plaintiff's claim is that the City of Burlington's policing

is disproportionately focused on people of color generally, and the city's police officer's use of

force has a similar disparate impact on people of color, and did so on Jeremie Meli, and these

results are a policy of the City. (*See Ex. 35 and Ex. 47*).

> In order to hold a municipality liable for the violation of a constitutional right, plaintiffs "must prove that `action pursuant to official municipal policy' caused the alleged constitutional injury."[Internal Citation Omitted] "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." [Internal Citation Omitted]

*Floyd v. City of New York*, 959 F. Supp. 2d 540, 557-558 SD New York (2013).

The practices over years that includes disparate treatment of black people, including

having their vehicles searched 3.6 times more often than white people, can be considered a

discriminatory policy. Additionally, the fact that 20.9% of use of force incidents occur against a

black population of 5.7% is further proof of a pattern of discriminatory policy. (*See Ex. 34 and

Ex. 35*)

Additionally, Chief del Pozo acknowledged that he had received the ACLU's assertion

that his officers were improperly using disorderly conduct statutes "downtown late at night"

against people of color (*See Ex. 19, 54:6-55:8*). However, Chief del Pozo could not recollect any

specific training he gave his officers (*See Ex. 19, 58:3-6*).

"[T]he inadequacy of police training may serve as the basis for § 1983 liability only

where the failure to train amounts to deliberate indifference to the rights of persons with whom

the police come into contact. This rule is most consistent with our admonition in *Monell,* 436 U.

S., at 694, and *Polk County* v. *Dodson,* 454 U. S. 312, 326 (1981)..." *Canton v. Harris*, 489 US

378, 388-389 (1989)

The City of Burlington's use of force policy was known by the Chief of Police to have a disproportionate effect on African Americans and yet this policy at the time of Sgt. Bellavance's actions had been in place unchanged for 5 years and predated Chief del Pozo's tenure as police chief. Chief del Pozo knew his officers were disproportionately using force on African Americans and took no actions to change the facially neutral policy which was producing disparate results. This constitutes a failure to train and the complete and deliberate disregard for the rights of African Americans, which resulted in the unlawful arrest of Plaintiffs.

**Official Capacity Claims Against Former Chief del Pozo should not be dismissed**

First, the Court should deny Defendants' motion to dismiss Plaintiff's official capacity claims against del Pozo because, even if he is released from liability in his official capacity under the federal claims, these claims still remain viable under the state law claims. "We recognize that we are not bound by federal law concerning Bivens actions and that such actions are brought against government officials rather than the government itself." *Zullo v. State*, 205 A. 3d 466, 489 (2019).

**Former Chief del Pozo is not Entitled to Summary Judgement**

Plaintiff meets the burden for a showing under the failure to train legal standard, because Plaintiff has shown that Chief del Pozo knew that the officers under his command were disproportionately using force against African Americans and that he chose not to take action in light of this information.  (*See Ex. 26 and Ex. 19, 58:3-6*).

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence. [Internal Citations Omitted] An officer who fails to

intercede is liable for the preventable harm caused by the actions of the other officers..."
*Anderson v. Branen*, 17 F. 3d 552, 557 (2nd Cir. 1994).

### Even if Sgt. Bellavance Enjoys Qualified Immunity the Suit may Proceed Against the City of Burlington under both State and Federal Constitutional Claims

Should the Court conclude that Sgt. Bellavance had qualified immunity by virtue of unsettled law but that Plaintiff's rights were violated, suit may proceed against the City of Burlington. "This point is significant because case law further suggests *Heller* will not save a defendant municipality from liability where an individual officer is found not liable because of qualified immunity. See, e.g., *Myers v. Okla. County Bd. of County Comm'rs*, 151 F.3d 1313, 1317 (10th Cir.1998); *Barber v. City of Salem*, 953 F.2d 232, 237-38 (6th Cir.1992). The municipality enjoys no qualified immunity shield. *Myers* at 1317. Hence, the suit may proceed against it when the jury verdict does not answer the question of whether defendant officers actually violated plaintiff's constitutional rights." *Curley v. Village of Suffern*, 268 F. 3d 65, 72-3 (2nd Cir. 2000) citing *Myers v. Okla. County Bd. of County Comm'rs*, 151 F.3d 1313, 1317 (10th Cir.1998)

### Sgt. Bellavance and Ofc. Campbell are not Entitled to the Relief Sought Because They Lacked Probable Cause to Arrest Albin

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Under any analysis Ofc. Campbell and Sgt. Bellavance's actions were unreasonable. Defendant's argument appears to be that it is objectively unreasonable for a person to watch a sibling be assaulted and receive a

potentially fatal head injury and express any concern for their well being in anything but the most restrained manner.

While defendants claim that Albin "assaulted" Ofc. Campbell and this was their basis for arresting Albin, Albin's conduct did not constitute a criminal violation.

Defendants argue that Officer Cambell was afraid Albin was going to assault him, however when viewed in context, Ofc. Campbell was not afraid and, on the night of the incident had no intent to arrest Albin for assault on a law enforcement officer (*See Ex. 14, at 2:35*).

Evidence presented by Plaintiff, at the very least, creates the logical inference that Ofc. Campbell did not actually believe that Albin Meli was attempting to physically menace him or anyone else at the scene and only falsely created this fear after consulting with Sgt. Bellavance one day later (*See Ex. 24*).

Here, Albin showed compliance with all of Ofc. Campbell's directions.  He never posed any threat to anyone, and he in no way attempted to resist or evade  (*See Ex. 7, 37:15-38:3, and Ex. 13, 113:13-14*).  Defendants can attempt to muddy the factual waters all they want in trying to paint Albin as angry and aggressive.  However, the witnesses, Ofc. Campbell's actions toward Albin during the incident, and the video paint a different picture. (*See Ex. 28, Ex. 14, and Ex. 3, 41:11-15*)

### Regardless of Probable Cause it is Clearly Established that Ofc. Campbell used Excessive Force

Plaintiff's rendition of events places the three factors to be considered in any excessive force case in Plaintiff's favor: "...(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Tracy v. Freshwater*, 623 F. 3d 90, 96 (2nd Cir. 2010); see also *Graham v. Connor*, 490 US 386 (1989).

Even if a jury were to conclude that Ofc. Campbell could have reasonably arrested Albin by taking him to the ground with other Officers, what happened next, would still be grounds for a finding of liability under 42 USC 1983 against Ofc. Campbell and Sgt. Bellavance.

While Albin was pinned to the ground by multiple Officers, he informed Ofc. Campbell that his hand was being injured during handcuffing. Ofc. Campbell heard this statement and acknowledged it but took no corrective action (*See Ex. 14 at 3:03*).  As a result of Ofc. Campbell and Sgt. Bellavanc's inactions in responding to Albin's pleas for help, Albin suffered an injury in his thumb that led to diminished range of motion and shooting pains (See Ex. 13, 25:1-2, and 29:19-25). This action by Ofc. Campbell and Sgt. Bellavance has consistently been found to constitute excessive force in the 2nd Circuit:

> "[I]n evaluating the reasonableness of handcuffing, a Court is to consider evidence that: (1) the handcuffs were unreasonably tight; (2) the defendants ignored the [plaintiffs'] pleas that the handcuffs were too tight; and (3) the degree of injury to the wrists." Case, 233 F. Supp. 3d at 385 (internal quotation marks omitted) (quoting *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008)); see also *Lloyd v. City of New York*, 246 F. Supp. 3d 704, 724 (S.D.N.Y. 2017). Courts have placed particular emphasis on the injury requirement, see *Usavage v. Port Auth. of New York & New Jersey*, 932 F. Supp. 2d 575, 592 (S.D.N.Y. 2013), and "[t]here is a consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort," *Lynch*, 567 F. Supp. 2d at 468.

*Serrano v. City of New York*, No. 16 Civ. 8105 (S.D.N.Y., 2018)

Here the excessive force claim is substantially similar to *Usavage*. "Plaintiff alleges a variation on that familiar theme: specifically, that Sweizer pushed down on the handcuffs over Plaintiff's protests and compressed them to an excessive degree, thereby causing physical injury. This difference does not justify a departure from the general rule, since the heart of Plaintiff's allegation—that an officer used handcuffs as a weapon against an arrestee— falls squarely within the imagined scenario for which this rule was created. *See Lynch,* 567 F.Supp.2d at 468; *Esmont,*

371 F.Supp.2d at 214-15." *Usavage v. Port Authority of New York and New Jersey*, 932 F. Supp. 2d 575, 594-595 (SDNY, 2013)

### Sgt. Bellavance and Ofc. Campbell's Actions Constitute Intentional Infliction of Emotional Distress

Albin's claim for intentional infliction of emotional distress is simple;  1) Albin's brother was assaulted by Sgt. Bellavance; 2) Albin was standing within feet of his brother when this assault occurred and thought Sgt. Bellavance had killed Jeremie; 3) The intentional actions of Sgt. Bellavance caused Albin to suffer severe emotional distress; and 4) As a result of Albin exclaiming his fear that his brother was in severe physical distress, he was arrested, injured and falsely charged with crimes by Ofc. Campbell. (*See Ex. 13, 115:14-24, Ex. 6, Ex. 14 at 14:38, Ex. 25, 26:6-8 and 68:4-21 and Ex. 26*).

A jury could find that the malicious and intentional acts of Sgt. Bellavance on Jeremie, the excessive force employed on Albin by Ofc. Campbell and Sgt. Bellavance and the deliberate attempts to charge Albin with a felony and an assault on law enforcement, that he did not commit, is exactly the factual pattern if proved, that could reach the standard of an IIED claim.

> "The conflicting testimony created fact issues for the jury as to whether Officer Corpes's arm was injured by the act of striking Bender in the mouth and whether Officer Corpes falsely claimed to have been bitten and wrongfully initiated an assault charge against Bender. If the jury resolved both these issues in favor of Bender, as it apparently did, then New York might well regard the officer's actions as sufficiently outrageous to satisfy the conduct element of the emotional distress tort.

*Bender v. City of New York, 78 F.3d 787 (2nd Cir. 1996)*

### Ofc. Campbell Committed Battery Against Albin

Ofc. Campbell does not enjoy qualified immunity in taking Albin to the ground and then injuring his hand after Albin informed him that he was in pain (See Ex. 14, 3:00-:3:30). Ofc. Campbell is liable for the battery he committed against Albin and Sgt. Bellavance is liable for

battery for assisting, instead of intervening, in Ofc. Campbell's improper detention. As to the distinction between discretionary acts and ministerial acts, using and facilitating excessive force does not fall under the ambit of discretionary acts. It would be reasonable for a jury to find for Albin on this count against Ofc. Campbell. See *Christman v. Davis*, 889 A.2d 746, 2005 VT 119 (Vt. 2005).

**Sgt. Bellavance is not Entitled to the Relief Sought from Albin Meli's Claims**

Regardless of whether Ofc. Campbell was privileged to take Albin Meli to the ground, Sgt. Bellavance had a duty to intervene when he became aware that Ofc. Campbell was using his handcuffs to commit battery against Albin Meli. "A police officer "has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir.1988). Failure to intercede to prevent an unlawful arrest can be grounds for § 1983 liability. *Id*." *Ricciuti v. NYC Transit Authority*, 124 F. 3d 123, 129 (2nd Cir. 1997).

The 2nd Circuit describes how supervisory liability can be established for constitutional violations: "[the supervisor] (i) personally participated in the alleged constitutional violation, (ii) was grossly negligent in supervising subordinates who committed the wrongful acts, or (iii) exhibited deliberate indifference to the rights of the plaintiff by failing to act on information indicating that unconstitutional acts were occurring. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)." *Provost v. City of Newburgh*, 262 F. 3d 146, 154 (2nd Cir. 2000).

Sgt. Bellavance not only facilitated the unconstitutional acts of his subordinate officers, he was the original cause of them (*See Ex. 6*).  What is worse, is that he consciously furthered this deprivation when he reviewed and approved Ofc. Campbell's affidavit of probable cause that

set forth allegations that were not present on the night of the incident. (*See Ex. 25, 26:6-8 and*

*68:4-21, Ex. 14 at 14:38, and Ex. 15*)

**Dismissal of State Law Claims Against Albin is Improper**

While the 42 USC 1983 claims against Sgt. Bellavance and Ofc. Campbell preclude the

City of Burlington from Respondeat Superior liability, Albin's state law claims face no such

restriction.

> To establish that a servant's conduct falls within the scope of his or her employment, a
> plaintiff must demonstrate that the conduct:
>> (a) ... is of the kind the servant is employed to perform; (b) ... occurs substantially
>> within the authorized time and space limits; (c) ... is actuated, at least in part, by a
>> purpose to serve the master; and (d) in a case in which force is intentionally used
>> by the servant against another ... is not unexpectable by the master.
> *Id*.; *Sweet v. Roy*, 173 Vt. 418, 430-31, 801 A.2d 694, 703-04 (2002). The conduct of an
> employee falls outside the scope of employment if it is "different in kind from that
> authorized, far beyond the authorized time or space limits, or too little actuated by a
> purpose to serve the master. Restatement (Second) of Agency § 228(2); *Sweet*, 173 Vt. at
> 431, 801 A.2d at 704.

*Doe v. Forrest*, 853 A. 2d 48, 54-55 VT (2004).

Should Sgt. Bellavance and Ofc. Campbell's actions be found to fall outside the scope,

employment liability may still attach to the City of Burlington. "Thus, consistent with our

previous references to [Restatement (Second) of Agency] § 219(2)(d), we expressly adopt this

provision of the Restatement as applicable in assessing whether an employer has vicarious

liability for the tortious conduct of an employee when that conduct falls outside the scope of his

or her employment." *Doe v. Forrest*, 853 A. 2d 48, 57 VT (2004). As *Doe* makes clear, it is Sgt.

Bellavance and Ofc. Campbell's apparent authority as Law Enforcement Officers which enabled

them to commit the tortious act, if it is found to fall outside their scope of employment.

According to State law, to hold Ofc. Campbell personally liable and not merely his

employer, the Plaintiff must show "that a law enforcement officer acting within the scope of the

officer's duties either acted with bad faith or knew or should have known that those actions violated clearly established law." *Zullo v. State*, 205 A. 3d 466, 472 VT (2019).[3]

"Good or bad faith is a state of mind, *Brown*, supra, 314 F.2d at 679, provable by circumstantial as well as direct evidence." *Myers v. Ambassador Ins. Co., Inc.*, 508 A. 2d 689, 691 (Vt. 1986) citing *Johnson v. Hardware Mut. Cas. Co.*, 109 Vt. 481, 494 (1938). Additionally, the state law claims "bad faith,...may take the form of discriminatory animus." *Zullo v. State*, 205 A. 3d 466, 503 (2019).  There is a genuine dispute in material fact that  Sgt. Bellavance and Ofc. Campbell acted in bad faith when they arrested, hurt and falsely charged Albin with serious crimes that he did not commit.  (*See Exhibits 6, 13, 14,  and 36, 55:6-12*)

### Summary Judgement for the City of Burlington Against Albin is Improper

Plaintiff's claim is that the City of Burlington's policing is disproportionately focused on people of color generally, and the City's Police Officer's use of force has a similar disparate impact on people of color, and did so on Albin Meli, and these results are a policy of the City.

> In order to hold a municipality liable for the violation of a constitutional right, plaintiffs "must prove that `action pursuant to official municipal policy' caused the alleged constitutional injury."[Internal Citation Omitted] "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." [Internal Citation Omitted]

*Floyd v. City of New York*, 959 F. Supp. 2d 540, 557-558 SD New York (2013).

The City of Burlington and its police department have a history of improper interactions with people of color and use of force against people of color, especially downtown late at night. (*See Ex. 26*) Chief del Pozo acknowledged that he had received the ACLU's assertion that his officers were improperly using disorderly conduct statutes "downtown late at night" against

---

[3] Dr. Seguino's racial disparity research is relied upon by the Court in Zullo in their analysis of State Law claims.

people of color (*See Ex. 19, 54:6-55:8*). However, Chief del Pozo could not recollect any training

he gave his officers beyond a vague discussion at roll call (*See Ex. 19, 58:3-6*).

"[T]he inadequacy of police training may serve as the basis for § 1983 liability only

where the failure to train amounts to deliberate indifference to the rights of persons with whom

the police come into contact." *Canton v. Harris,* 489 U.S. 378 (1989). Only where a

municipality's failure to train its employees in a relevant respect evidences a "deliberate

indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a

city "policy or custom" that is actionable under § 1983.

### Albin's Official Capacity Claims Against Former Chief del Pozo and Sgt. Bellavance should not be Dismissed

First, the Court should deny Defendants' motion to dismiss Plaintiff's official capacity

claims against Chief del Pozo and Sgt. Bellavance because, while the claims share a great deal of

commonality with the claims against the City, there are differences in the liability and proof

required. "[T]o state official capacity claims, Plaintiffs had to assert that an official policy or

custom was the moving force of a constitutional violation." *See Gutierrez v. Cobos*, Civ No.:

12-980 (D.N.M. 2014); citing *Monell v. New York City Dept. of Social Servs*., 436 US 658, at 694

(1978).

Further, even if Sgt. Bellavance and Chief del Pozo are released from liability in their

official capacity under the federal claims; these claims still remain viable under the state law

claims. "We recognize that we are not bound by federal law concerning Bivens actions and that

such actions are brought against government officials rather than the government itself." *Zullo v.*

*State*, 205 A. 3d 466, 489 (2019).

### Former Chief del Pozo and Sgt. Bellavance are not Entitled to Summary Judgement

Albin meets the burden for a showing under the failure to train legal standard, because Albin has shown that Chief del Pozo knew that the officers under his command were disproportionately using force against African Americans and that he chose not to take action in light of this information (*See Ex. 34*).

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence. See *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir.1988); *Byrd v. Clark*, 783 F.2d 1002, 1007 (11th Cir.1986); Webb v. Hiykel, 713 F.2d 405, 408 (8th Cir. 1983); *Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir.1982), cert. denied, 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983); *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972). An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers..." *Anderson v. Branen*, 17 F. 3d 552, 557 (2nd Cir. 1994).

### Sgt. Bellavance is Not Entitled to the Relief Sought from Charlie's Claims

Regardless of which Officer actually detained Charlie Meli, Sgt. Bellavance faces liability for the unlawful seizure of Charlie for two reasons. First, he instructed officers under his command to cite and detain Charlie where Sgt. Bellavance did not observe any criminal behavior by Charlie and no criminal behavior had occurred (*See Ex. 22 at 6:48*). Second, Sgt. Bellavance had a duty to prevent Officers under his command from detaining Charlie. Instead, Sgt. Bellavance encouraged his subordinate officers to enhance the constitutional violations perpetrated on Charlie (*See Ex. 22 at 6:55*). "A police officer "has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir.1988). Failure to intercede to

prevent an unlawful arrest can be grounds for § 1983 liability. *Id*." *Ricciuti v. NYC Transit Authority*, 124 F. 3d 123, 129 (2nd Cir. 1997).

The 2nd Circuit describes how supervisory liability can be established for constitutional violations: "Provost could have demonstrated such personal involvement by a supervisory defendant such as Sorrentino by establishing to the satisfaction of the jury that Sorrentino (i) personally participated in the alleged constitutional violation, (ii) was grossly negligent in supervising subordinates who committed the wrongful acts, or (iii) exhibited deliberate indifference to the rights of the plaintiff by failing to act on information indicating that unconstitutional acts were occurring. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)." *Provost v. City of Newburgh*, 262 F. 3d 146, 154 (2nd Cir. 2000).

Here Sgt. Bellavance knew that he had not seen Charlie Meli commit a crime and yet instructed officers under his command to charge Charlie Meli with either impeding an officer or disorderly conduct despite their initial intent to release Charlie. During this conversation an unidentified officer can be heard saying, "No charges for him," referring to Albin, and also stated that he is in "timeout," (*See Ex. 22 at 6:00-6:48*).  However, after Sgt. Bellavance instructed his officers to charge Charlie with Disorderly Conduct, or Impeding a Law Enforcement Officer, which is a felony, Charlie was arrested. Under *Provost*, this fact alone is sufficient to establish Sgt. Bellavance's liability. "It does not foreclose the liability of a person who, with knowledge of the illegality, participates in bringing about a violation of the victim's rights but does so in a manner that might be said to be "indirect" — such as ordering or helping others to do the unlawful acts, rather than doing them him — or herself." *Id* at 155.

Here, the officers' affidavits and rendition of events differ significantly from what is shown on their body cams. Although Charlie was crying and clearly distressed, 2nd Circuit case

law does not provide Sgt. Bellavance with qualified immunity in these circumstances. Sgt. Bellavance knew at the time he instructed his officers to charge Charlie with impeding an officer or disorderly conduct that Charlie was a witness to him causing a potentially lethal injury to Charlie's older brother, Jeremie.  It could be concluded by a jury that Sgt. Bellavance instructed the unlawful arrest of Charlie in an effort to minimize his own legal exposure.

"[A]n officer who concedes the possibility that there were justifiable reasons for disruptive conduct underlying a plaintiff's arrest is hard-pressed to establish that he had probable cause as a matter of law on the intent element of § 240.20. Here, as in *Gagnon,* "[t]he jury was entitled to conclude that [the arresting] officers were aware of [the plaintiff's] legitimate reason for shouting, but arrested [him] nonetheless." *Gagnon,* 696 F.2d at 20." *Id* at 158.

There is no question that, in the 2nd Circuit and under the case law of the State of Vermont, at the time Sgt. Bellavance instructed officers to cite Charlie Meli that they did so illegally.

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would [have understood] that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. Al-Kidd,* 131 S.Ct. 2074, 2083 (2011) citing *Anderson v. Creighton*, 483 U.S. 635 (1987) and *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

As to the Defendant's contention that Charlie Meli was not seized, the facts do not support their argument. Charlie Meli can be seen being taken into custody by Burlington Police

Officers and is later shown being taken into the station house and then transported to Chittenden County Correctional Facility (*See Ex. 9*). Sgt. Bellavance had a duty to intercede the entire time that Charlie Meli was in the custody of the Burlington Police Department, yet only encouraged his officers to further the unlawful detention.

Under the facts, Sgt. Bellavance cannot obtain Qualified Immunity. "To obtain summary judgment on qualified immunity grounds in connection with a claim of failure to intercede to prevent an illegal arrest, a defendant must show that the only result a fair jury could reach is that reasonably competent police officers, faced with the information available to the non-intervening officer at the time of the arrest, could disagree about the legality of the arrest. *See Lennon,* 66 F.3d at 420-21 (discussing summary judgment standards in qualified immunity context)." *Id.* at 129

Plaintiff has latitude in citing what constitutes clearly established law. "Of course, "general statements of the law are not inherently incapable of giving fair and clear warning" to officers…" *White v. Pauly*, 137 S. Ct. 548 (2017); citing *United States v. Lanier*, 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997).

Defendants may seek to conflate the definition and case law of Burlington's noise ordinance as established in *Costello v. City of Burlington*, 632 F. 3d 41 (2nd Cir. 2011) and *Howard Opera House Associates v. Urban Outfitters*, 322 F. 3d 125 (2nd Cir. 2003) with the actual case law on Vermont's disorderly conduct criminal statutes as established by *State v. Albarelli*, 19 A. 3d 130 VT (2011), the most recent case on the issue to be decided and the only one which deals with criminal charges related to Vermont's disorderly conduct Statute.

In *Albarelli*, Burlington police charged the defendant alleging he ""recklessly created a risk of public inconvenience or annoyance when he engaged in violent, tumultuous or

threatening behavior, TO WIT, by yelling aggressively." Here "the behavior must convey the intent to do harm to another person. We cannot find that defendant's actions conveyed such an intent." *State v. Albarelli*, 19 A. 3d 130, 137 VT (2011). The officers on the scene do not reference any threatening behavior by Charlie Meli, and thus, his arrest was not proper.

Further, reliance on the deposition testimony of Sgt. Bellavance, years after the fact, who encouraged an unlawful arrest on Charlie Meli regarding what he thought Charlie Meli might do, is improper justification to charge as disorderly conduct. "[T]he probable cause inquiry is based upon whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest. *Devenpeck v. Alford,* 543 U.S. 146, 153, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004)." *Jaegly v. Couch*, 439 F. 3d 149, 153 (2nd Cir. 2006).

As to the tumultuous element of the charge, the court in *Albarelli* viewed the decision of the trial court favorably where the court "also decided not to charge the jury that defendant's behavior could be found to be "tumultuous," the second element in the statutory language. Apparently, the court concluded that the element of tumultuous behavior, especially in the context of behavior in an open public place in which many persons congregated, was overbroad and raised a serious risk of criminalizing protected speech." *Id* at 134.

Defendants may argue that the noise element of the disorderly conduct statute provides them with qualified immunity as discussed earlier regarding the 2nd circuit's holding in *Provost*, this is insufficient.

The Burlington Police Department has a long history of improperly charging disorderly conduct in a way that violates the First Amendment and in the months prior to the events of September 9th, 2018 received information from the Vermont ACLU that their officers were

improperly charging people of color with disorderly conduct in violation of the 1st and 4th amendments (*See Ex. 26*).

This is precisely the proof which Defendants claim Plaintiff lacks when they cite to *Flanigan v. Town of Colchester*, 171 F. Supp. 2d 361 (D. Vt. 2001) and *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658 (1978). Mr. del Pozo knew that his officers were improperly charging disorderly conduct and agreed with the Vermont ACLU when they informed him of such, yet, he took no action to prevent these constitutional which resulted in the unlawful arrest of Charlie Meli.

### Dismissal of Charlie's State Law Claims is Similarly Improper

While the 42 USC 1983 claims against Officers Bellavance and Campbell preclude the City of Burlington from Respondeat Superior liability, Charlie's state law claims face no such restriction.

> Under the settled doctrine of respondeat superior, an employer or master is held vicariously liable for the tortious acts of an employee or servant committed during, or incidental to, the scope of employment." *Brueckner v. Norwich Univ.*, 169 Vt. 118, 122-23, 730 A.2d 1086, 1090 (1999). We (Vermont) have adopted the elements of scope of employment set out in Restatement (Second) of Agency § 229(1). See id. at 123, 730 A.2d at 1091. To establish that a servant's conduct falls within the scope of his or her employment, a plaintiff must demonstrate that the conduct:
>> (a) ... is of the kind the servant is employed to perform; (b) ... occurs substantially within the authorized time and space limits; (c) ... is actuated, at least in part, by a purpose to serve the master; and (d) in a case in which force is intentionally used by the servant against another ... is not unexpectable by the master.
>
> *Id.*; *Sweet v. Roy*, 173 Vt. 418, 430-31, 801 A.2d 694, 703-04 (2002). The conduct of an employee falls outside the scope of employment if it is "different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master. Restatement (Second) of Agency § 228(2); *Sweet*, 173 Vt. at 431, 801 A.2d at 704.
>
> *Doe v. Forrest*, 853 A. 2d 48, 54-55 VT (2004).

Should Sgt. Bellavance's actions be found to fall outside the scope, employment liability may still attach to the City of Burlington. "Thus, consistent with our previous references to [Restatement (Second) of Agency] § 219(2)(d), we expressly adopt this provision of the Restatement as applicable in assessing whether an employer has vicarious liability for the tortious conduct of an employee when that conduct falls outside the scope of his or her employment." *Doe v. Forrest*, 853 A. 2d 48, 57 VT (2004). As *Doe* makes clear, it is Sgt. Bellavance's apparent authority as Law Enforcement Officers which enabled them to commit the tortious act, if it is found to fall outside their scope of employment.

The Vermont State Constitution provides that "an implied private right of action for damages is available directly under Article 11." *Zullo v. State*, 205 A. 3d 466, 472, 486 VT (2019). The Vermont Supreme Court has construed Article 11 to provide broader protections than the Fourth Amendment in several contexts. See *State v. Cunningham*, 2008 VT 43, ¶ 16, 183 Vt. 401, 954 A.2d 1290; *State v. Bauder*, 2007 VT 16, ¶ 10, 181 Vt. 392, 924 A.2d 38; *State v. Sprague*, 2003 VT 20, ¶¶ 16-20, 175 Vt. 123, 824 A.2d 539.

Sgt. Bellavance's conduct should be examined under the rubric from *Crowell v. Kirkpatrick*, which lays out how close the standards for the state law claims are to the federal law claims:

> Under Vermont law, "lower-level government employees are immune from tort liability when they perform discretionary acts in good faith during the course of their employment and within the scope of their authority." *Hudson v. Town of East Montpelier*, 161 Vt. 168, 171, 638 A.2d 561 (1993). Further, to determine whether a state employee is acting in "good faith," Vermont law relies on the same federal objective standard described in *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727, and asks whether the Defendants' conduct violated "clearly established rights ... of which a reasonable person would have known." *Stevens v. Stearns*, 175 Vt. 428, 434, 833 A.2d 835 (2003) (quoting *Harlow*, 457 U.S. at 818, 102 S.Ct. 2727); see also *Murray v. White*, 155 Vt. 621, 630, 587 A.2d 975 (1991) ("Good faith exists were an official's acts did not violate clearly established rights of which the official reasonably should have known."). And, just as in the § 1983 context,

whether a right is "clearly established" depends on the specific circumstances encountered by the Defendants, and the contours of the right must be sufficiently clear that a reasonable officer would know that his conduct is unlawful. *Cook v. Nelson*, 167 Vt. 505, 512, 712 A.2d 382 (1998); *Napolitano v. Flynn*, 949 F.2d 617, 624 (2d Cir.1991) (recognizing "Vermont's public policy that `[government] officials should fear suit only where... the unlawfulness of their acts is apparent.'") (quoting *Murray*, 155 Vt. at 632, 587 A.2d 975).[24]

*Crowell v. Kirkpatrick*, 667 F. Supp. 2d 391, 417 D. VT (2009).

According to State law, to hold Sgt. Bellavance personally liable and not merely his employer, the Plaintiff must show "that a law enforcement officer acting within the scope of the officer's duties either acted with bad faith or knew or should have known that those actions violated clearly established law." *Zullo v. State*, 205 A. 3d 466, 472 VT (2019).[4]

"Good or bad faith is a state of mind, *Brown*, supra, 314 F.2d at 679, provable by circumstantial as well as direct evidence." *Myers v. Ambassador Ins. Co., Inc.*, 508 A. 2d 689, 691 (1986) citing *Johnson v. Hardware Mut. Cas. Co.*, 109 Vt. 481, 494 (1938). Additionally, the state law claims "bad faith,...may take the form of discriminatory animus." *Zullo v. State*, 205 A. 3d 466, 503 (2019).  Charlie has provided substantial evidence that Sgt. Bellavance acted in bad faith when he ordered his officers to unlawfully arrest him in an attempt to silence him from a legitimate protest to police brutality.

### Charlie's Official Capacity Claims Against Former Chief del Pozo and Sgt. Bellavance Should not be Dismissed

First, the Court should deny Defendants' motion to dismiss Charlie's official capacity claims against del Pozo and Sgt. Bellavance because, while the claims share a great deal of commonality with the claims against the City, there are differences in the liability and proof required. "[T]o state official capacity claims, Plaintiffs had to assert that an official policy or custom was the moving force of a constitutional violation." *See Gutierrez v. Cobos*, Civ No.:

---

[4] Dr. Seguino's racial disparity research is relied upon by the Court in Zullo in their analysis of State Law claims.

12-980 (D.N.M. 2014); citing *Monell v. New York City Dept. of Social Servs*., 436 US 658, at 694 (1978).

The distinction between official capacity suits and personal-capacity suits is more than "a mere pleading device." *Hafer v. Melo*, 502 US 21, 27 (1991); *See also Will v. Michigan Dept. of State Police*, 491 U. S. 58 (1989).

### Even if Sgt. Bellavance Enjoys Qualified Immunity, which he does not, the Suit may Proceed Against the City of Burlington Under Both State and Federal Constitutional Claims

Should the Court conclude that Sgt. Bellavance had qualified immunity by virtue of unsettled law but that Plaintiff's rights were violated, suit may proceed against the City of Burlington. "This point is significant because case law further suggests *Heller* will not save a defendant municipality from liability where an individual officer is found not liable because of qualified immunity. See, e.g., *Myers v. Okla. County Bd. of County Comm'rs*, 151 F.3d 1313, 1317 (10th Cir.1998); *Barber v. City of Salem*, 953 F.2d 232, 237-38 (6th Cir.1992). The municipality enjoys no qualified immunity shield. *Myers* at 1317. Hence, the suit may proceed against it when the jury verdict does not answer the question of whether defendant officers actually violated plaintiff's constitutional rights." *Curley v. Village of Suffern*, 268 F. 3d 65, 72-3 (2nd Cir. 2000) citing *Myers v. Okla. County Bd. of County Comm'rs*, 151 F.3d 1313, 1317 (10th Cir.1998)

"[One Officer's data] provide a perfect example of how racial profiling leads to a correlation between the racial composition of crime suspects and the racial composition of those who are stopped by the police...treating generic crime complaint data specifying little more than race and gender as a basis for heightened suspicion." *Floyd* at 606.

WHEREFORE, Plaintiffs request that Defendants' Motion for Summary Judgement as to all Plaintiffs be DENIED.

Dated at Brattleboro, Vermont this 27th day of August, 2021.

ALBIN MELI, ET AL.

By:     */s/Evan Chadwick*
Evan Chadwick, Esq.
PO Box 6182
Brattleboro VT 05302
Evan@chadwicklawvt.com