```
 1            (Break taken from 10:08 a.m. to 10:13 a.m.)
 2   BY MR. CHADWICK:
 3       Q.    I want to go down -- we're still on Exhibit 17
 4   here.  I want to go down to page 3.  You see where I am?
 5       A.    Yes.
 6       Q.    And I want to go over the last paragraph of
 7   this letter by Mr. Diaz and what it states there.  Do
 8   you recall reading this last paragraph where Mr. Diaz
 9   says "The arrests in these cases demonstrate a troubling
10   pattern of Burlington Police unlawfully retaliating in
11   violation of individuals' First Amendment rights.  We
12   bring these incidents to your attention to urge you to
13   assure that your officers understand the full scope of
14   rights protected under the First Amendment and that they
15   do not act in violation of these rights.  As you are
16   aware, such violations only serve to increase tensions
17   between law enforcement and the communities they serve,
18   particularly among traditionally overpoliced communities
19   of color."
20            Do you recall reading that?
21       A.    In sum and substance, yes.
22       Q.    Okay.  And in there Mr. Diaz is pointing you
23   to a troubling pattern; is that correct?
24       A.    Mr. Diaz is alleging a troubling pattern, yes.
```

1    Q.   Violating people with colors' constitutional
2  rights; right?
3    A.   He's alleging that, yes.
4    Q.   Okay.  And that these violations are actually
5  causing relationships between law enforcement and
6  communities of color to disintegrate; correct?
7    A.   He's alleging that they're introducing
8  tensions in those relationships.
9    Q.   Okay.  Now, is it, in your view and your
10 extensively experiences a law enforcement officer, is it
11 okay to beat someone up for committing the act of
12 disorderly conduct?
13   A.   For the police to beat someone up for
14 committing disorderly conduct?
15   Q.   Yes.
16   A.   That's all they've done is just --
17   Q.   Disorderly conduct.
18   A.   That doesn't present a fact pattern that
19 indicates a need for force.
20   Q.   Does not present a fact pattern that would
21 constitute a use of force because the individual that is
22 alleged to have been causing disorderly conduct is not a
23 danger at that point; is that correct?
24   A.   No.  Actually --

1  question.
2          You can answer.
3     A.   That's the only conversation I recall.  But I
4  know that this was actually discussed at roll calls as
5  well, so I guess in some sense, I discussed this with
6  dozens of police officers.
7     Q.   Would it surprise you to hear that
8  Officer Hodges does not recall any conversation with you
9  regarding this incident?
10    A.   Given that Officer Hodges I believe is now
11 working somewhere in Pennsylvania and that years have
12 gone by and that this was something that happened years
13 ago, knowing my own recollection fades, I wouldn't be
14 surprised to know that he didn't recall either.
15    Q.   So just so I'm clear, you did not have any
16 specific conversation with Officer Hodges or any other
17 officers about your concern about their threats to knock
18 someone out.  It was more about the case law surrounding
19 disorderly conduct; correct?
20    A.   I didn't --
21         MS. BLACKMAN:  Object to the form of the
22 question.
23         Brandon, you got to slow down.
24         Object to the form of the question.

```
 1  correct?
 2       A.   Yes.
 3       Q.   Now, after you received this initial email,
 4  did you go back and watch the body cam footage?
 5       A.   Sometime later when I returned from
 6  convalescent leave.
 7       Q.   Do you remember roughly when that was?
 8       A.   Mid-September.  I can look it up to refresh my
 9  memory, but yeah.
10       Q.   So within a couple of weeks after the actual
11  incident.
12       A.   That's fair to say, yes.
13       Q.   Okay.  And you watched the whole body cam, and
14  the body cam that you watched, was that
15  Sergeant Bellavance's body cam?
16       A.   Yes.  I watched others, but that was one of
17  the ones I watched.
18       Q.   Okay.  When you first watched it, what was
19  your initial reaction to the incident?
20       A.   My initial reaction was that
21  Sergeant Bellavance tried to separate Mr. Meli from the
22  bar employee by pushing Meli away from him and Meli fell
23  and hit his head and went unconscious and that would
24  require an internal investigation.
```

1  Q.  So your initial reaction after looking at the
2  video was that this required an internal investigation
3  on whether Bellavance's actions were justified; is that
4  correct?
5  A.  Yes.
6  Q.  That was your gut reaction after watching this
7  video one time?
8  A.  Yes.
9      MS. BLACKMAN:  Object to the form of the
10 question.
11     You can answer.
12 Q.  And what was -- what were the basis for that
13 initial determination?
14 A.  Well, the injury that Mr. Meli suffered
15 rendered him unconscious apparently in the video, and
16 the fact that it was a serious injury required
17 investigation.
18     I also understood that a third party had made
19 a civilian complaint about but also -- a citizen
20 complaint.  Also from what I understood when I got back
21 from convalescent leave, because all this happened while
22 I was on medical leave, that Meli's mother had
23 complained as well about what happened.  And I wanted to
24 be sure, since Sergeant Bellavance didn't issue verbal

1  in the face as an act of assault.
2         So that plus the altercation is what I
3  understand to be the facts that Mr. Bellavance has in
4  mind, but, nonetheless, whenever possible, you can use
5  verbal commands to separate two people who may be
6  escalating with each other.
7     Q.   Based on that video, he had time to use verbal
8  commands, didn't he; correct?  Is that correct?
9     A.   He could have used verbal commands, yes.
10    Q.   He was walking up the street approaching a
11 verbal argument; correct?
12        MS. BLACKMAN:  Object to the form of the
13 question.
14        You can answer.
15    A.   He was walking up the street to prevent an
16 argument from escalating into a second assault, yes.
17    Q.   Would you agree that the only person that
18 ended up getting hurt as a result of
19 Sergeant Bellavance, in your words, attempting to
20 intervene was Jeremie Meli as a result of
21 Sergeant Bellavance's push?
22    A.   Yes.
23    Q.   Syd didn't get hurt; right?  Sinan Eren?
24    A.   No, it doesn't look like that.

1  with the Freddie Gray incident?

2      A.   Not to my knowledge.

3      Q.   Okay.  But would you agree that the
4  Freddie Gray incident was troubling?

5      A.   Yes.

6      Q.   Okay.  So you enlisted the two experts who
7  conducted interviews.  Is that correct?

8      A.   Yes.

9      Q.   And then based on those investigations and
10 also your review, you issued determinations on the use
11 of force of Sergeant Bellavance; correct?

12     A.   Yes.

13     Q.   Okay.  Now, I'm going to go here to a couple
14 of exhibits.  Let me share screen again.  So we're going
15 to go to Exhibit 3.

16          I guess I'll ask you this first.  Did either
17 of the individuals you retained, either Mr. Burgess or
18 the gentleman out of Baltimore, did either of them find
19 that Sergeant Bellavance's use of force was excessive?

20     A.   Scott Swanson found that, like, in sum and
21 substance that he could have used verbal commands in
22 lieu of the shove, which I agree with, and that made the
23 outcome of Mr. Meli getting injured -- the counter
24 factual was we would have never known if Mr. Meli would

1  have been injured if Jason Bellavance had taken the time
2  to use verbal commands, and that was a reasonable option
3  he should have exercised.
4      Q.   So it was a reasonable option to use verbal
5  commands before --
6      A.   Yes.
7      Q.   And under all of the circumstances which you
8  and your independent experts reviewed, it found that the
9  reasonable response would have first been to use verbal
10 commands; correct?
11     A.   Yes.
12     Q.   And would you say that it was unreasonable for
13 Sergeant Bellavance not to use verbal commands prior to
14 using force?
15     A.   Yes.
16     Q.   And would you -- okay.
17          So with that, we are now at Plaintiff's
18 Exhibit 3.  Now, this is -- have you ever seen Exhibit 3
19 before, Brandon?  It's involving Officer Joseph Corrow
20 involving a separate incident that happened a day before
21 involving a gentleman by the name of Mabior Jok.
22     A.   Yes.
23     Q.   Have you seen this better before?
24     A.   Yes.

1            MS. BLACKMAN:  Object to the form of the
2    question.
3            You can answer.
4       A.   I'd like to go on the record to say that I
5    believe I made a mistake here.  I should have broken up
6    these allegations into their component parts.  I also
7    made the mistake -- the purpose of an internal
8    investigation is not to opine on the lawfulness or
9    unlawfulness of an act, so I was wrong in putting that
10   word unlawful in.  I made a mistake.
11      Q.   So --
12      A.   That's for the prosecutors to determine.
13      Q.   Okay.
14      A.   I was totally wrong in putting unlawful in
15   there.  It wasn't my jurisdiction, so to speak.  I
16   didn't have a standing to put that word in there.
17   That's a mistake.  This document has a mistake in it.
18      Q.   You do realize, Mr. del Pozo, that these
19   letters hold significant legal weight in our case.
20      A.   No, no.  I --
21           MS. BLACKMAN:  Whoa, whoa.  Object to the form
22   of the question.
23           Brandon, you got to slow down.  He's arguing
24   with you.

1  rules. We'll talk about that later.
2  BY MR. CHADWICK:
3       Q.   Mr. del Pozo, what is, in your view, what's
4  the different between unnecessary and excessive?
5            MS. BLACKMAN:  Object to the form of the
6  question.
7            You can answer.
8       A.   Unnecessary is when force is used that a
9  reasonable police officer could have found an
10 alternative to, that would be expected to find an
11 alternative to, or exercise options prior to that would
12 preclude or minimize the need for force.
13           Excessive is when force was necessary but the
14 officer used too much of it.
15      Q.   Okay. So would unnecessary force be force
16 that -- so you're saying unnecessary force is force that
17 was used that did not need to be used; is that correct?
18      A.   That there's cause to believe that there are
19 options that the officer could have safely exercised
20 that could have precluded the need for force.
21      Q.   So would another way to say it be that it was
22 more force?
23      A.   No. The simple fact of the force is what
24 would have made it unnecessary.

1    Q.    So force that was used but did not need to be
2  used; correct?
3    A.    Right.
4         MS. BLACKMAN:  Object to the form of the
5  question.
6         Go ahead.  Answer.
7    A.    Right.  I found that there was ample
8  opportunity to safely issue a strong verbal command, a
9  verbal commands of some sort, instructions, identify
10 oneself, et cetera, and because that was not undertaken,
11 we had cause to believe that the push was unnecessary
12 and also departed from the expectations of training.
13   Q.    So you would agree that the statement that
14 force is more force than no force; correct?
15        MS. BLACKMAN:  Object to the form of the
16 question.
17        You can answer.
18   A.    Yes.
19   Q.    So you would agree that that would be -- that
20 force would be in excess of no force; correct?
21        MS. BLACKMAN:  Object to the form of the
22 question.
23        You can answer.
24   A.    No.  Not the way we define this here.  If

```
 1      Q.   What was the evidence?
 2      A.   Beer.
 3      Q.   So you suspended officers for three weeks for
 4 drinking beer that was seized as evidence?
 5      A.   Yes.
 6      Q.   And you suspended Sergeant Bellavance for
 7 using force when it was not necessary which resulted in
 8 a brain injury, or Jeremie suffering a serious body
 9 injury, you suspended Sergeant Bellavance for one week.
10      A.   Yes.
11           MS. BLACKMAN:  Object to the form of the
12 question.
13           You can answer.
14      Q.   Why was consuming beer considered a more
15 serious offense in your mind than the actions of
16 Sergeant Bellavance against Jeremie Meli?
17      A.   Well, there were two reasons for that.  The
18 first is that the longest suspension ever given in
19 anyone's memory for any force-related allegation was
20 against an officer named Ryan Rabideau before I came to
21 the Burlington Police Department, and that suspension
22 was for one day and the suspension was for one day for
23 knowingly and intentionally dropping a handcuffed person
24 on their face while he was in custody.  And as a matter
```

of jurisprudence, when you're looking at consistency and escalatory discipline, there's a lot of jurisprudential reasons why you can't wildly diverge from sentencing.

If you look at fastidious defense attorneys and folks in the ACLU, the folks at VIPR, the rights of people convicted of things, they would say if the most serious imposition ever given for an even worse offense is one year, then why are you now sentencing my defendant for four years? I think the court has a legitimate interest in making sure that if you're going to -- and I was -- I felt very, very strongly about increasing the penalties for excessive force. I felt that Ryan Rabideau was underdisciplined. I felt that we needed to really break the precedent and start handing out stricter discipline for use of force complaints that were substantiated.

But by going -- so what I did was, in fact, make Sergeant Bellavance's penalty, if you're going percentwise, it was 400 percent more than the most serious one ever given. The union came to me and said, My God. Like, you're adding days and days of extra penalty when the other guy did something much worse. And I said, Yes, it's important to be serious about this, but, you know, we have to do in a way that

```
 1   comports with the jurisprudential concern of consistency
 2   and sentencing.  So I felt like I was taking a very,
 3   very serious escalation of discipline for the use of
 4   force.  I was sending the signal that it's just going to
 5   continue to get more and more serious.  But, obviously,
 6   you can't go from one day to 15 days.  You can't go from
 7   one day to three weeks.  That would be -- so that's one
 8   the reasons.
 9            The other reason is that with the beer,
10   there's never any circumstance ever in any of policing
11   anywhere under any construal where consuming evidence is
12   ever countenance.  There's no -- if you look at the
13   Vermont State Police, the -- almost the minimum penalty
14   for that is termination; right?  So an officer can
15   never, ever supply a plausible reason why he or she
16   would ever consume the state's evidence.  That's just
17   mishandling of evidence.  It's categorically wrong.
18   There's never justification for it.
19            Officers every day from the day they get to
20   the police academy are trained in the legitimate use of
21   force.  They can articulate I had a reason to push
22   someone.  I was wrong.  I made a mistake.  I caused an
23   injury I shouldn't have.  What I did was unnecessary.
24   But I'm trained to separate people who may fight.  I'm
```

1  trained to separate people who are escalating.  My goal
2  is to restore peace to a disorderly situation.  I did
3  that wrong and I found that they did that wrong.  But
4  there are many, many reasons why an office would
5  legitimately push someone.  There's never a good reason
6  why they would destroy evidence.
7          So as you can see when you're asking why
8  there's the spread, Sergeant Bellavance's penalty was a
9  400 percent increase on the most serious use of force
10 penalty given in anyone's memory so it was an attempt to
11 take a much more serious approach to force but it had to
12 be governed by precedent.  And it was of a completely
13 different nature.  It was something that an officer's
14 trained to do, that they have a legitimate reason to do,
15 whereas destroying evidence is categorically
16 unacceptable.
17         So that explains the scheme that you saw.
18    Q.   Okay.  So Riley Rabideau, that was the
19 suspension that you kind of based your review on; is
20 that correct?
21    A.   If we were speaking like, you know, legally,
22 it was sort of like the precedent under which I was
23 bound to administer discipline.
24    Q.   And I believe that you just classified the

```
 1      Q.   So I just want to be clear with this, "For
 2   which" -- on Question 6 -- "For which you have or had an
 3   account or for which you have used someone else's
 4   account to conduct activity for the last two years."
 5           You're saying that your answer covers those
 6   parts of the question.
 7      A.   No, I'm saying -- no, I'm saying my answer was
 8   true.  That every statement I made there was true.
 9           Can you -- it would be helpful for me to
10   answer the question if you could maybe point me towards
11   a statement in there that's not true, that you believe
12   is not true.
13      Q.   Well, I believe that -- well, I'm not going to
14   get into an argument about what I believe is true or
15   not.
16           But you had other accounts, didn't you?  You
17   had another account, at least one that we know of;
18   correct?
19      A.   Yes.
20      Q.   And that was the WinkleWatchers account?
21      A.   Well, there was also, I think in the amended
22   interrogatory, like Front Porch Forum and stuff, but
23   yes.
24      Q.   Right.  But that was the main one that was the
```