UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

ALBIN MELI; CHARLIE MELI;      )
JEREMIE MELI;                  )
                               )
     Plaintiffs,               )
                               )
     v.                        )      Case No. 2:19-cv-71
                               )
CITY OF BURLINGTON, VERMONT;   )
BRANZON DEL POZO; JASON        )
BELLAVANCE; CORY CAMPBELL;     )
                               )
     Defendants.               )

## OPINION AND ORDER

Plaintiffs Albin Meli and Jeremie Meli bring this action alleging that members of the Burlington Police Department ("the Department") used excessive force in violation of their constitutional rights. Plaintiffs also bring Vermont state law claims of battery, assault, intentional infliction of emotional distress, and gross negligence against members of the Department. Additionally, Plaintiff Charlie Meli alleges an arrest without probable cause in violation of his Fourth Amendment rights. Finally, Albin, Jeremie, and Charlie all allege that Defendant City of Burlington and Brandon Del Pozo, formerly the Chief of Police for the City of Burlington, allowed a pattern and practice of failing to train, supervise and discipline officers, that amounted to gross negligence under

Vermont state law and deliberate indifference to Plaintiffs'
rights under the Fourth and Fourteenth Amendments.

Defendants now move for summary judgment, arguing that
there was no unlawful conduct and that the individual Defendants
are entitled to qualified immunity. Plaintiffs oppose the
motion, arguing that genuine issues of material fact preclude
dismissal of their claims as a matter of law. For the reasons
set forth below, Defendants' motion for summary judgment is
**granted in part and denied in part**.

## Factual Background

On the evening of September 8, 2018, Jeremie Meli went out
for drinks with his brothers, Albin and Charlie Meli. Plaintiffs
first went to Splash at the Boathouse while waiting for Kelly
Wassick, Charlie Meli's girlfriend, to finish her shift working
at a restaurant. After Kelly completed her shift, the group took
an Uber to What Ales You bar, a local bar in the downtown
Burlington, Vermont area, sometime around 10:30 p.m. Jeremie
Meli had a shot of whiskey upon arriving at the bar. Jeremie
then remembers heading to the bathroom. The rest of his memory,
however, is comprised of "split second" flashes of being on the
ground outside of What Ales You and later being in the hospital.

Matthew Fay was bartending at What Ales You that evening.
In the early hours of the morning of September 9, 2018, a fight
broke out between Plaintiffs, other patrons, and What Ales You

staff members. While working his shift, Fay heard commotion from the fight and approached the group to intervene. Upon approaching, Fay saw Plaintiff Jeremie Meli yelling at another patron. Jeremie then left the bar. Shortly thereafter, a member of the What Ales You staff called the police.

Jeremie turned onto Main Street as he exited the bar. Burlington Police Sergeant Jason Bellavance exited his car nearby to respond to the 911 call. As he approached, Bellavance encountered Fay on the corner of Main Street and St. Paul Street. Sergeant Bellavance then walked towards What Ales You and saw Jeremie Meli and bar owner Sinan Eren engaged in a verbal argument. Upon arriving at the spot where Eren and Jeremie stood, Sergeant Bellavance pushed Jeremie forcefully, causing him to fall backwards, hit his head, and lose consciousness. Sergeant Bellavance then called for medical assistance while other officers began to arrest Jeremie. A struggle ensued between Jeremie and several police officers. Jeremie was later charged with simple assault, disorderly conduct and resisting arrest.

Albin Meli left the bar with his brother, Jeremie, and rounded the corner onto Main Street. Albin watched Sergeant Bellavance push Jeremie forcefully into a wall. At this point, Police Officer Cory Campbell arrived on the scene. Albin was visibly upset after watching his brother's injury and became

3

increasingly distressed, pleading with the officers to stop touching his brother. ECF No. 144 at 5. After making physical contact with Officer Campbell, Albin Meli was taken to the ground by several police officers, handcuffed, arrested, and charged with disorderly conduct, simple assault and impeding an officer. He was later charged with assault on a police officer.

Charlie Meli was still inside What Ales You when his brother Jeremie was injured. Upon walking outside, Charlie saw Jeremie on the ground and Albin being arrested. Charlie began to show signs of distress including screaming and crying. Officers then put handcuffs on Charlie, *see* Pls. Ex. 21 at 3:30, and placed him in the back of a police cruiser while he repeatedly said, "please don't put me in there." *See id.* at 5:30-6:30. Charlie was charged with disorderly conduct. The State subsequently dropped all charges against the Meli brothers. All three Plaintiffs in this case are Black.

Following this incident, the Burlington Police Department conducted an internal investigation of Sergeant Bellavance's use of force against Jeremie. The investigation resulted in Sergeant Bellavance receiving a four-day suspension without pay. Bellavance was later terminated from the Burlington Police Department.

The following facts remain currently disputed between the parties:

4

1.   It is disputed what occurred between Eren and Jeremie as Sergeant Bellavance approached the scene. Specifically, the nature of the argument is disputed. Defendants describe a tense, "chest-to-chest" exchange with Jeremie yelling and appearing to be the aggressor. *See* ECF 134-1 at 2. Plaintiffs argue that the two individuals were not "chest-to-chest," that there was a "visible space" in between them, and that Eren poked Jeremie in the chest as Sergeant Bellavance approached. *See* ECF No. 144-2 at 8. It is undisputed that Fay identified Jeremie for Bellavance as the person who had hit him a few times.[1] Defendants argue that as Bellavance approached, Jeremie appeared to be in an active argument with Eren, and was therefore justified when he used "a reasonable amount of force to try to separate [Plaintiff] who [had been identified as assaulting Mr. Fay] and appeared to be actively agitated, yelling at, and about to assault [Mr. Eren]." Defs. Ex. F, 181:23-182:3. Conversely, Plaintiffs argue that Jeremie was not acting as an aggressor, and that Sergeant Bellavance ignored the fact that as he approached, Jeremie yelled to Eren that "you guys started a

---

[1] While Plaintiffs argue that Jeremie never hit Fay, it is clear from Sergeant Bellavance's bodycam footage that at the very least, Fay told Bellavance that he had been hit by Jeremie. *See* Pls. Ex. 6 at 00:30-00:50. The Court will accept the bodycam footage as undisputed. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (holding that video evidence was sufficient to preclude any genuine dispute of material fact for summary judgment purposes).

fight." Pls. Ex.6 at 0:56-1:00. Plaintiffs also allege that the
argument between Eren and Meli was not at risk of escalating,
that Eren did not feel threatened, and that as one witness
described "it didn't appear . . . remotely to be headed towards
violence." Pls. Ex. 7 at 20:9-11. Upon reviewing the bodycam
footage, the Court concludes that a reasonable interpretation of
the video suggests that the fight was a verbal altercation.[2]
While both Jeremie and Eren faced one another yelling, there was
no indication that Jeremie was about to assault Eren.[3]

    2.   It is undisputed that Albin was upset after watching
Jeremie hit his head. The way Albin conveyed his distress,
however, is disputed. Defendants argue that Albin was "pointing
his fingers and yelling and swearing." Defs. Ex. G 34:6-14. On
the contrary, Plaintiffs introduced a statement by witness
Nathan Bradbury who remarked that he was "amazed at how
compliant . . . [Albin] was with the officer's requests." Pls.
Ex. 7 37:15-38:3. Defendants also claim that Officer Campbell
gave Albin several verbal commands to
"back away," all of which Albin ignored. *See* ECF No. 133-8 at 7.
Plaintiffs allege that Officer Campbell directed the commands to
"back away" to witness Nathan Bradbury, not to Albin.

---

[2] *See Scott,* 550 U.S. at 381.

[3] *See id.*

3.    The nature of Albin's physical contact with Officer Campbell is disputed. Defendants argue that Albin shoved Officer Campbell's shoulder with enough force to cause him to lose his balance. Plaintiffs argue that he placed his hand on Officer Campbell's shoulder, pleading with him to "please tell them to stop." Pls. Ex. 6 at 5:06.

4.    What happened after Albin made contact with Officer Campbell is also disputed. Defendants allege that Officer Campbell took Albin to the ground and felt it was necessary to do so because Albin had just shoved him. Albin argues that Campbell and several other officers tackled him after Bellavance yelled "[g]et him down, get him down." Pls. Ex. 6 at 5:11. Albin alleges that this response was unnecessary, excessive, and that his hand was injured while being restrained. Plaintiffs cite then-Chief of Police Brandon Del Pozo's Internal Affairs letter addressed to Sergeant Bellavance, in which he noted "Meli's brother became alarmed at Meli's injuries, having witnessed the fall. The sound of his head striking the ground or the wall was audible . . . and his unconsciousness was notable. It was normal for his brother to become alarmed and act the way he did . . . Pls. Ex. 30 at 3-4.

5.    It is disputed what Charlie Meli did once he exited the bar. Defendants argue that Charlie repeatedly refused to comply with police officer instructions to stand back.

7

Plaintiffs allege that Charlie did comply with officer commands but admits that he was visibly upset after witnessing both of his brothers be injured by law enforcement.

6.   Some dispute exists as to what the Department's investigation into Bellavance's use of force against Jeremie concluded. Defendants admit that the investigation determined that Bellavance's actions were not consistent with Department training. Defendants also argue that the internal investigation concluded that Sergeant Bellavance's actions were neither excessive nor unlawful. Plaintiffs, however, argue that the internal affairs letter issued by the Department indicates that Bellavance's use of force was unnecessary or unreasonably departed from expectations of training, and that he did not have sufficient cause to use that level of force. *See* Pls. Ex. 30 at 3-4.

## Procedural History

Plaintiffs Jeremie, Charlie, and Albin Meli filed this lawsuit in federal court on May 2, 2019. In that complaint, Jeremie alleged the intentional use of excessive force by Sergeant Bellavance constituted an illegal and unreasonable seizure in violation of his Fourth Amendment rights. He also alleged that Defendant City of Burlington has a pattern and practice of failing to adequately discipline, train, supervise and otherwise direct police officers with regard to knowledge,

recognition, and respect of, and for violations of, the constitutional rights of citizens and persons, which amounts to deliberate indifference to his constitutional rights. Jeremie also alleged that Defendant Bellavance's actions constituted assault, battery, intentional infliction of emotional distress, and gross negligence.

Albin Meli alleged that Officer Campbell and Sergeant Bellavance's intentional use of excessive force and physical brutality constituted illegal and unreasonable seizures. In addition, Albin alleged that Defendant Bellavance and Campbell's assault of Jeremie and Albin, followed by their arrest without just cause, constituted the intentional infliction of emotional distress. Albin also alleged battery and gross negligence against Sergeant Bellavance and Officer Campbell. Finally, Albin alleged that Defendant City of Burlington has a pattern and practice of failing to train, supervise, and direct police officers which amounted to a deliberate indifference to his well-established constitutional rights.

Charlie Meli claimed that the actions taken by Defendants Bellavance, Campbell, Del Pozo, and the City of Burlington against him were unreasonable, unnecessary, and excessive, and amounted to gross recklessness and callous indifference to his constitutional rights, in particular the right to be free from unlawful seizure.

9

Plaintiffs' amended complaint, filed on September 30, 2019, restated the above causes of action. Additionally, all three Plaintiffs alleged the disparate use of force against Black citizens. Plaintiffs describe a pattern where officers "identify themselves as law enforcement and issue verbal commands when encountering disorderly situations involving white persons . . . . [versus] officers fail to identify themselves, act aggressively towards and deploy sudden and overwhelming force . . . when encountering disorderly situations involving black persons." ECF no. 21 at 12-13. Plaintiffs argue that Defendant Del Pozo and the City of Burlington allowed a pattern and practice of disparate use of force against Black citizens in violation of Plaintiffs' Fourteenth Amendment rights.

On July 1, 2021, Defendants moved for summary judgment. Defendants argue that there is no genuine dispute of material fact as to whether their conduct violated Plaintiffs' constitutional rights. Additionally, Defendants argue that Sergeant Bellavance and Officer Campbell used a reasonable amount of force given the circumstances, and that they are entitled to qualified immunity.

Plaintiffs oppose the motion for summary judgment, arguing that there are genuine disputes of material fact as to what happened during the interaction between the Burlington Police Department and the Meli brothers on the night of September 8,

10

2018. Furthermore, Plaintiffs allege that there is evidence of disparate use of force against different racial groups. Plaintiffs therefore submit that the questions of whether the use of force violated their constitutional rights and Vermont state law, and whether Defendant Del Pozo and the City of Burlington have allowed a pattern and practice of disparate use of force to prevail within the Department, should be submitted to the jury.

## Discussion

### I.   Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). In evaluating information presented in summary judgment, "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue

11

of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party to demonstrate a genuine issue of material fact. Fed. R. Civ. P. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. However, "mere speculation and conjecture is insufficient to preclude the granting of the motion." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). "On a motion for summary judgment, a fact is material if it 'might affect the outcome of the suit under the governing law.'" *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of N.Y.*, 746 F.3d 538, 544 (2d Cir. 2014) (quoting *Anderson*, 477 U.S. at 248).

At the summary judgment stage, the inquiry should not be "whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005); *see also Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e]

12

[summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses.").

## II.  **Fourth Amendment Excessive Force Claim**

The Fourth Amendment makes it unlawful for a police officer to use "unreasonable and therefore excessive force . . . in the course of effecting an arrest." *See Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). Excessive force claims under the Fourth Amendment are assessed under the "objective reasonableness standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989). The *Graham* factors guide the objective reasonableness inquiry and consider "the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest." *See Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) (citing *Graham*, 490 U.S. at 396). The officer's actions should be judged based on the facts of the situation, "without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. Using the *Graham* standard, summary judgment is appropriate only when "no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004).

Furthermore, when analyzing excessive force claims, courts should look at the situation "from the perspective of a reasonable officer on the scene, rather than with the 20/20

vision of hindsight" and must make "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396-97. The inquiry into whether "the force used . . . is 'reasonable' under the Fourth Amendment 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8 (1985) (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)).

**A. Jeremie's Fourth Amendment Claim**

Jeremie's version of events varies substantially from that of Sergeant Bellavance, creating significant disputes of fact. For summary judgment purposes, a court must view the facts in the light most favorable to the non-moving party. Viewing the facts in Jeremie's favor, the Court must accept as true that when Sergeant Bellavance arrived on the scene, Jeremie did not exhibit violent behavior or pose a cognizable risk to Sergeant Bellavance or the public. Instead, Jeremie was involved in a verbal disagreement with bar owner Sinan Eren but did not give any indication that he was about to cause Eren physical harm. Furthermore, when Sergeant Bellavance arrived outside of the bar

14

Fay told him that Jeremie had hit him. Bellavance did not witness the alleged assault himself. Without inquiring into the situation, Sergeant Bellavance shoved Jeremie forcefully into a wall. Jeremie offered no resistance and did not disobey any orders. Instead, he was knocked unconscious, became disoriented, and exhibited signs of traumatic brain injury.

Viewing the facts from the perspective of a reasonable police officer on the scene, the Court accepts that Sergeant Bellavance was told that Jeremie had assaulted someone. It is undisputed that officer Sergeant Bellavance did not issue any verbal commands before using force. Jeremie denies that he was acting violently or that he was about to hit Eren, but Sergeant Bellavance alleges he believed Jeremie was about to become violent.

The factual disputes presented by these two versions of events are material. Jeremie's version of events depict him having a verbal disagreement with Eren without risk of escalating violence. Eren indicated in his deposition that he did not feel threatened by Jeremie. *See* Pls. Ex. 3 at 51:22-24 and 37:23-38:5. Conversely, Defendants argue that Jeremie was "yelling at" Eren and that he was "about to assault [him]." *See* Defs. Ex. E at 181:24-182:3.

1. **Severity of the Crime**

In assessing the officer's reasonableness, a court should consider the nature and severity of the crime leading to the arrest. *Graham*, 490 U.S. at 396. Taking the facts most favorable to the non-moving party, Plaintiffs allege that Jeremie did not hit Fay. *See* Pls. Ex. 13 at 81:14-17. However, it is undisputed that Fay told Sergeant Bellavance that Jeremie had hit him. *See* Pls. Ex. 6 at 00:30-00:50. Under Vermont law a person who engages in a "fight or scuffle . . . by mutual consent" is guilty of a misdemeanor punishable by "not more than 60 days" in prison or not more than a $500 fine, or both. 12 V.S.A. section 1023(b). Simple Assault is punishable by up to one year in prison or a fine of not more than $1,000, or both. *Id.* Therefore, although the crime involves violence, it is considered a misdemeanor under local law. Furthermore, the alleged crime had already occurred, it was not occurring as Sergeant Bellavance approached, which would have necessitated immediate intervention.

2. **Threat to the Public and the Officer**

In assessing reasonableness, a court is also to consider the risk the arrestee poses to the officer and the public. From Defendants' perspective, Sergeant Bellavance had sufficient cause to approach and question Plaintiff after being informed by Fay that Plaintiff had hit him. *See Loria v. Gorman*, 306 F.3d 1271, 1289 (2d Cir. 2002)("A]n officer may rely on a complaint

16

to establish probable cause and cannot be held liable for a constitutional violation simply because the complaint turns out to have been false."). Furthermore, crowds and situations involving disorderly conduct can pose a threat to officers and public safety. *See Brayshaw v. City of Burlington*, No. 5:13-CV-253, 2015 WL 1523019, at *9 (D. Vt. Apr. 3, 2015); *Cuviello v. Expo,* 2013 WL 3894164, at *6 (E.D. Cal. July 27, 2013)*; see also Gomez v. City of Whittier*, 211 F. App'x 573, 575-76 (9th Cir. 2006) (acknowledging the government's legitimate interest in maintaining the control of the crowd). However, even in situations of disorderly conduct force is not necessarily justified.

        In *Brayshaw*, this Court granted the City of Burlington's motion for summary judgment on a Fourth Amendment Excessive Force claim noting that "[p]laintiff continued to physically resist Sergeant Bellavance's efforts to move him away from the crowd and when an unruly crowd began to participate in their exchange, it was objectively reasonable for Sergeant Bellavance to believe that he had probable cause to arrest Plaintiff for disorderly conduct." 2015 WL 1523019, at *7. This Court further concluded that the use of an arm takedown "was objectively reasonable in light of clear evidence that a mere verbal request would not suffice." *Id*. at *8. This case varies considerably from *Brayshaw*, however. Here, no verbal command was given.

Plaintiff was not given any warning that law enforcement was
approaching, and he was not given any orders to which he could
comply. Instead, viewing the facts in a light most favorable to
the non-moving party, Sergeant Bellavance initiated the use of
force without identifying himself, asking Plaintiff to do
anything, or making any attempt to de-escalate the situation.
Because there are genuine issues of material fact in dispute as
to the risk posted by Jeremie to either the police or the
public, this *Graham* factor weighs against granting summary
judgment.

### 3. **Resisting Arrest**

Jeremie submits that he offered no resistance at any time.
Instead, he was knocked unconscious, became disoriented and
subsequently demonstrated signs of traumatic brain injury. *See*
Pls. Ex. 38 (describing in Jeremie's medical report that "it is
. . . [Dr. Trudell's] professional opinion, which [she] hold[s]
to a reasonable degree of medical certainty, that Mr. Meli
experienced a mild TBI with post-concussive syndrome, which has
resulted in mild neurocognitive impairment and neurobehavior
changes with psychological disturbance"). Defendants argue that
Jeremie began to resist and kick officers while he was on
ground. *See* Defs. Ex. G at 47:24-48:4. However, after reviewing
the video evidence, the Court concludes that Jeremie did not
resist before Sergeant Bellavance used force against him, as he

had not been placed under arrest or given a verbal command.[4]
Because Jeremie's excessive force claim is limited to Sergeant
Bellavance's alleged assault, any conduct that occurred after
the alleged assault, including resisting arrest, is not relevant
to the inquiry as to whether the use of force was excessive.
What is relevant to the inquiry is that Jeremie was not
resisting arrest at the time that force was used against him.
Therefore, this *Graham* factor also weighs against granting
summary judgment.

### 4. Constitutional Violation

In sum, it is disputed whether a third party was
immediately in danger, or if Jeremie was about to assault
someone. It is undisputed that Sergeant Bellavance did not
witness an assault and that he used force without first issuing
a verbal warning. The Supreme Court has acknowledged that there
is no "easy-to-apply legal test in the Fourth Amendment context
[and that] . . . we must still slosh our way through the
factbound morass of 'reasonableness.'" *Scott*, 550 U.S. at 383.
Accepting Jeremie's version of events, a question arises as to
whether a reasonable officer would have believed that Jeremie

---

[4] *See Scott,* 550 U.S. at 380-81 (holding that a court can, based
on its interpretation of a video evidence, view "the facts in
the light depicted by the videotape").

posed an immediate threat to the safety of others such that the use of force was warranted.

In *Crowell v. Kirkpatrick*, this Court granted summary judgment in an excessive force case. 667 F. Supp. 2d 391, 408 (D. Vt. 2009). In doing so this Court relied specifically on the fact that: "(1) the Plaintiffs remained in control of the situation the entire time, and could have avoided the use of force entirely by simply complying with a lawful order; [and] (2) the Defendants gradually progressed through varying degrees of lesser force before deciding to use their Tasers; . . ." *Id.* None of those same factors exist here. Sergeant Bellavance did not give Jeremie the opportunity to avoid force. Sergeant Bellavance did not even identify himself before using force. Furthermore, there was no gradual progression of force. Instead, Sergeant Bellavance approached and immediately made forceful physical contact. Furthermore, the Burlington Police Department's own internal investigation concluded that Sergeant Bellavance's actions departed from Burlington Police Department's standards and training. *See* Pls. Ex. 30. Former Police Chief Brandon Del Pozo acknowledged that it was "unreasonable for Sergeant Bellavance not to use verbal commands prior to using force." Pls. Ex. 19 at 106: 13-14 (also finding that there was "ample opportunity to safely issue a strong

verbal command . . . instructions, identify oneself, et cetera . . ." *Id.* at 117:7-12.

The Court cannot conclude at this stage that no reasonable juror could find that Sergeant Bellavance's actions in this case constituted excessive force in violation of Jeremie's Fourth Amendment rights.

**B. Qualified Immunity**

Sergeant Bellavance has also moved for summary judgment on the basis of qualified immunity. Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In deciding a government official's qualified immunity claim on summary judgment, a court must consider (1) "whether the facts shown 'make out a violation of a constitutional right'"; and (2) "'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'" *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (quoting *Pearson*, 555 U.S. at 232). A right is considered "clearly established" when "[t]he contours of the right . . . [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Okin v. Vill. of Cornwall-On-Hudson Police*

*Dep't*, 577 F.3d 415, 433 (2d Cir. 2004) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

For the reasons set forth above, a reasonable juror could conclude that Sergeant Bellavance violated Jeremie's Fourth Amendment rights. The inquiry therefore shifts to whether Jeremie Meli's right was clearly established. While "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," *Saucier v. Katz*, 533 U.S. 194, 202 (2001), police officers can nevertheless "be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also Terebesi v. Torreso*, 764 F.3d 217, 237 (2d Cir. 2014) ("An officer is not entitled to qualified immunity on the grounds that the law is not clearly established every time a novel method is used to inflict injury.")(quotation marks omitted)(quoting *Mendoza v. Block,* 27 F.3d 1357, 1362 (9th Cir.1994)). When determining if a law is clearly established, courts should consider "the specificity with which the right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." *Terebesi*, 764 F.3d at 231. Furthermore, the law can be considered clearly established even in the absence of case law in the relevant circuit if decisions

from other circuits "clearly foreshadow a particular ruling on the issue." *Id.* (quotation marks omitted) (quoting *Varrone v. Bilotti,* 123 F.3d 75, 79 (2d Cir. 1997)).

Taking the facts in the light most favorable to Plaintiff, it is clearly established law that a reasonable officer would know the type of force inflicted on Jeremie Meli violated his constitutional rights. The Second Circuit has held that it is a clearly established violation of the Fourth Amendment for a police officer to use considerable force against an unresisting detainee who poses no threat to officers or public safety. *See Tracy*, 623 F.3d at 98-99. The Second Circuit has also held that it is clearly unconstitutional for an officer to strike a person who is complying with commands and not posing a risk to public safety. *See Rogoz v. City of Hartford,* 796 F.3d 236, 247-48, 251 (2d Cir. 2015) (denying summary judgment on the basis of qualified immunity when the officer jumped on a compliant subject's back while he was prone on the ground).

In the current case, Jeremie had not been placed under arrest, nor had he been given any orders by Sergeant Bellavance. Therefore, it cannot be said that he was resisting arrest or not complying. *See King v. United States*, 917 F.3d 409, 431 (6th Cir. 2019) ("It is impossible to resist an arrest (or detention) without knowing that an arrest (or detention) is being attempted."). Furthermore, the Second Circuit and a number of

23

other circuits have held that using "arm takedowns" and other
maneuvers to take a person to the ground, including pushes and
shoves, without cause violates clearly established law. *See,
e.g.*, *Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006)("Our
review of the record shows that each plaintiff who has brought
an excessive force claim has alleged sufficient facts from which
a reasonable factfinder could find that the NYSP employed
excessive force . . . . [f]or example, plaintiffs allege that
without provocation, the NYSP threw several plaintiffs to the
ground . . . ."); *see also Ciolino v. Gikas,* 861 F.3d 296, 303-
04 (1st Cir. 2017) (police officer's forceful takedown of
plaintiff arrestee violated clearly established law where
arrestee was not given a chance to submit peacefully to arrest);
*Montoya v. City of Flandreau*, 669 F.3d 867, 873 (8th Cir. 2012)
("[T]he contours of the right at issue were sufficiently clear
to inform a reasonable officer in . . . [the Defendant's]
position it was unlawful for him to perform a 'leg sweep' and
throw to the ground a nonviolent, suspected misdemeanant who was
not threatening anyone, was not actively resisting arrest, and
was not attempting to flee."). As the Sixth Circuit recently
made clear, "[a]ssaulting an unarmed and compliant individual
has been a clearly established violation of the Fourth Amendment
for decades." *Butler v. City of Detroit*, 936 F.3d 410, 425 (6th
Cir. 2019) (denying qualified immunity and finding an officer's

slamming of an arrestee into a wall violated clearly established federal law); *see, e.g., Stanfield v. City of Lima*, 727 F. App'x 841, 848 (6th Cir. 2018)(holding that a "takedown" in which was police officer shoved an arrestee from behind and tripped him was objectively unreasonable and violated arrestee's constitutional rights); *McCaig v. Raber*, 515 F. App'x 551, 555 (6th Cir. 2013) (denying qualified immunity for a police officer who used a leg sweep to take down an arrestee who "jerked away" but otherwise was not resisting arrest); *Burden v. Carroll*, 108 F. App'x 291, 293-94 (6th Cir. 2004)(holding that a police officer who shoved an arrestee into a brick wall was not entitled to qualified immunity, because even if the officer were "reasonably mistaken about the legality of using some force to secure the area when he first arrived on the scene . . . . [he] had adequate time to assess the situation" and conclude that the arrestee did not present a "safety or flight risk").

Taking the facts in a light most favorable to Plaintiff, Sergeant Bellavance is not entitled to qualified immunity. The precedent set forth above makes it clear that taking an arrestee to the ground who is not violent, resisting, or posing a threat to officers or the public violates clearly established law. Furthermore, the extent to which Plaintiffs dispute Defendants' version of events makes granting summary judgment on the basis of qualified immunity inappropriate. "Summary judgment on

qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness." *Thomas,* 165 F.3d at 143; *see also Cowan ex rel. Estate of Cooper v. Breen*, 352 F.3d 756, 764 (2d Cir. 2003)(holding that "[[b]ecause in this case genuine, material, factual disputes overlap both the excessive force and qualified immunity issues, summary judgment must be denied"); *Breen v. Garrison*, 169 F.3d 152, 153 (2d Cir. 1999) (holding that the "the amount of force used, the injuries suffered and the objective reasonableness of the officer's conduct" should be left to a jury when the parties' stories differ considerably on these issues and that those differences also bar summary judgment on the basis of qualified immunity). In this case, there are disputes of fact and those disputes are material and genuine. Summary judgment therefore cannot be granted on the basis of qualified immunity. **Defendants' motion for summary judgment on Jeremie Meli's excessive force claim is therefore denied.**

## C. Albin's Fourth Amendment Claim

There are a number of disputed facts regarding Burlington Police Department's interaction with Albin Meli. Defendants argue that Albin was screaming, swearing, and failing to comply with officers' requests after witnessing Jeremie's injury. Plaintiff denies disobeying orders. Defendants also argue that

"[p]laintiff shoved Officer Campbell in the shoulder" and that the shove "was forceful enough to cause Officer Campbell to lose his balance." *See* Defs. Ex. G at 47:21-48:4. Plaintiff admits that Albin placed his hand on Officer Campbell's shoulder, but that it was only to plead with him to stop the officers from hurting his brother. Witness Nathan Bradbury stated in his deposition that "when they grabbed him, he, as would anybody falling off balance, reached out, and from what I saw, that's what they called touching a police officer, which is a pretty big stretch if you ask me. Like, he was just trying to balance himself . . ." Ex. 7 at 38: 7-13.

It is undisputed that Officer Campbell and Sergeant Bellavance then took Plaintiff Albin Meli to the ground. Defendants allege that "Officer Campbell felt it was necessary to take Plaintiff to the ground for several reasons, including the need to prevent Plaintiff from further assaulting him." ECF No. 133-1 at 5 (citing Defs. Ex. G at 57: 1-6). Plaintiffs argue that the takedown was excessive and that Albin sustained injuries during the arrest. *See* Pls. Ex. 7 at 38:17-25 (Bradbury described that three officers took Albin to the ground and that he could "hear something snap as soon as they pulled his arm back"). In the bodycam footage, Albin tells officers several times that they were hurting him while he is being arrested. *See* Pls. Ex. 6 at 5:36.

27

**D. Qualified Immunity**

Defendants move for summary judgment on the basis of qualified immunity on Albin's excessive force claim. In assessing whether an officer is entitled to qualified immunity, the Court can begin with the "clearly established" inquiry first, and if it finds that a right was not clearly established, the Court may skip the constitutional inquiry all together. *See Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009)(recognizing that "judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand").

Here, the Court cannot conclude that a reasonable officer would understand that Sergeant Bellavance's and Officer Campbell's use of force violated clearly established law. Even taking the facts most favorable to Plaintiff, it is undisputed that Albin was yelling and made physical contact with Officer Campbell during the arrest of his brother. There are no direct cases in the Second Circuit establishing that taking a person down to the ground in a chaotic and threatening situation after they placed their hands on a law enforcement officer is a violation of clearly established law. To the contrary, there is some precedent in other circuits that suggests a law enforcement

officer is entitled to qualified immunity in these
circumstances. *See e.g., Borquez v. City of Tucson*, 475 F. App'x
663 (9th Cir. 2012)(finding that defendant police officer was
entitled to qualified immunity, because shoving plaintiff into a
wall after he grabbed the officer's arm did in fact constitute
excessive force, "[g]iven . . . that [Plaintiff] grabbed
[Defendant's] arm, we conclude that it would not have been
sufficiently clear to every reasonable officer whether Pacheco's
shove was unlawful under these conditions"); *Darrah v. City of
Oak Park*, 255 F.3d 301, 307 (6th Cir. 2001)(concluding that the
use of force was reasonable against a person who grabbed the
ankle of an officer as he effectuated the arrest of someone
else, noting that the officer "took relatively minimal measures
to free himself from Plaintiff, particularly after his first
attempt at shaking her loose was only temporarily effective").

Because several other courts have upheld the use of force
in circumstances where an arrestee places hands on an officer
coupled with the fact there is not clearly established law that
the use of force was unlawful, the Court cannot conclude that a
reasonable officer would be on notice that throwing Albin to the
ground after he touched that officer would violate clearly
established law. As such, Officer Campbell and Sergeant
Bellavance are entitled to qualified immunity. **For the foregoing**

**reasons summary judgment is granted on Albin's excessive force claim.**

### E. Charlie's Fourth Amendment Claim

Charlie Meli brings a false arrest claim against Sergeant Bellavance and Officer Campbell, alleging a violation of his Fourth Amendment Rights after being arrested for disorderly conduct. A factual dispute exists surrounding Charlie's interaction with Officer Campbell and Sergeant Bellavance. Defendants argue that Charlie Meli was yelling and not complying with police instructions to step back. *See* Defs. Ex. F at 41:19-21. Conversely, Plaintiffs convey a very different scenario—one in which Charlie Meli expressed deep concern after watching injuries be inflicted on both of his brothers, but continuously complied with and responded to police orders. *See* Pls. Ex. 21 at 0:40-0:50. Plaintiffs also maintain that Charlie's actions gave no indication that he would escalate into violence. Furthermore, it is not clear from the record what specific requests police officers gave Charlie, to which he allegedly did not comply, before arresting him. *See* Pls. Ex. 21 at 3:00-4:00.

### F. Qualified Immunity

Defendants move for summary judgment on the basis of qualified immunity on Charlie's false arrest claim. In general, a false arrest claim will not be successful if a police officer had probable cause or arguable probable cause to make the

arrest. *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004).
Under Vermont law, "[a] person is guilty
of disorderly conduct if he or she, with intent to cause public
inconvenience or annoyance, or recklessly creates a risk
thereof: (1) engages in fighting or in violent, tumultuous, or
threatening behavior;(2) makes unreasonable noise; (3) in a
public place, uses abusive or obscene language; (4) without
lawful authority, disturbs any lawful assembly or meeting of
persons; or (5) obstructs vehicular or pedestrian traffic." 13
V.S.A. § 1026(a)(1).

Even viewing the facts in the light most favorable to
Charlie, a reasonable police officer could believe he had
arguable probable cause to arrest Charlie for disorderly
conduct. As a result, the Court cannot conclude that it was
clearly established law that an arrest in this case would
violate Charlie's constitutional rights. The bodycam footage
clearly shows Charlie Meli demonstrating signs of distress, *see*
Pls. Ex. 21. Arresting a person for disorderly conduct when they
are in fact yelling, cursing, and making noise, even with the
remaining factual disputes, cannot be said to put a reasonable
officer on notice that an arrest would be unlawful. See *Stern v.
City of New York*, 665 F. App'x 27, 30 (holding that a "jury
could . . . reasonably have concluded that by yelling and
cursing and threatening, . . . [plaintiff] was making

31

'unreasonable noise'" and therefore was not entitled to judgment as a matter of law on whether officers had probable cause to arrest him for disorderly conduct); see also *Hollins v. City of New York*, 761 F. App'x  15, 16 (2019) (holding that a district court did not abuse its discretion in denying a new trial after a jury found that police officers had probable cause to arrest someone for "screaming profanities for several minutes around 10:00 p.m. on the street of a residential neighborhood"). As such, Officer Campbell and Sergeant Bellavance are entitled to qualified immunity. **For the foregoing reasons summary judgment is granted on Charlie's false arrest claim.**

**III. State law Claims**

**A. Jeremie's State Law Claims**

Sergeant Bellavance also moves for summary judgment on Jeremie Meli's state law claims of assault, battery, intentional infliction of emotional distress and gross negligence. Vermont law defines battery as an "intentional act that results in harmful contact with another." *Christman v. Davis*, 889 A.2d 746, 749 (Vt. 2005). This Court has held that "[w]hen assault and battery is alleged against police officers, 'the inquiry is whether the officer's conduct was reasonably necessary and thereby privileged.'" *Crowell,* 667 F. Supp. 2d at 417 (quoting *Smith v. District of Columbia*, 882 A.2d 778, 788 (D.C. 2005). While police officers can use force to lawfully arrest a

suspect, *see Green v. City of New York*, 465 F.3d 65,86 (2d Cir. 2006), that privilege terminates when "the force used is excessive, which is determined using the same standards used to analyze a Fourth Amendment excessive force claim." *Mayo v. Winn*, No. S0952-05CNC, 2009 WL 8103582, at *6 (Vt. Super. May 14, 2009) (citing *Evans-Reid v. District of Columbia*, 930 A.2d 930, 937 (D.C. 2007)). Because Jeremie's assault and battery claims, like his excessive force claim, turn on a question of reasonableness which considering material disputed facts should be left to the jury, the **Court denies summary judgment on Jeremie Meli's assault and battery claims**.

Sergeant Bellavance also moves for summary judgment on Plaintiffs' intentional infliction of emotional distress ("IIED") claim. IIED claims "require[] a plaintiff to establish 'outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct.'" *See Cook v. Arrowsmith Shelburne*, 69 F.3d 1235, 1242 (2d Cir. 1995) (quoting *McHugh v. Univ of Vermont*, 758 F. Supp. 945, 949 (D. Vt. 1991)). A successful IIED claim is one that goes "beyond all possible bounds of decent and tolerable conduct in a civilized community." *Fromson v. State*, 848 A.2d 344, 347 (Vt. 2004). "A plaintiff's burden on a claim of IIED 'is a heavy one.'" *Dulude*

*v. Fletcher Allen Health Care, Inc.,* 807 A.2d 390, 398 (Vt. 2002)(quoting *Gallipo v. City of Rutland,* 656 A.2d 635, 643 (Vt. 1994)); *see also Farnum v. Brattleboro Retreat, Inc.*, 671 A.2d 1249, 1256 (Vt. 1995) ("The test is objective; the plaintiff must show that the harm resulting from the inflicted distress was so severe that no reasonable person could be expected to endure it."). The Vermont Supreme Court has "declined to find outrageous conduct based solely on the alleged illegal motives underlying the conduct." *Fromson v. State*, 848 A.2d 344, 349 (Vt. 2004). Furthermore, the inquiry into whether a jury could reasonably find that an officer's conduct was "so outrageous and extreme as to go beyond all possible bounds of decency" is first a question of law for the court. *See Jobin v. McQuillen,* 609 A.2d 990, 993 (Vt. 1992) ("It is for the court to determine as a threshold question whether a jury could reasonably find that the conduct at issue meets the test.").

Plaintiffs have not introduced evidence to demonstrate that Sergeant Bellavance's use of force against Jeremie was "so outrageous . . . and so extreme . . . as to go beyond all possible bounds of decency." *Demag v. Am. Ins. Companies*, 508 A.2d 697, 699 (Vt. 1986). Additionally, there is no evidence in the record that suggests that Sergeant Bellavance intended to cause Jeremie emotional distress. *See Beaudry v. McKnight,* No. 2:17-CV-23, 2019 WL 1296628, at *17 (D. Vt. Mar. 21, 2019)

34

(holding that "Plaintiff's allegations may be construed as claiming Officer McKnight caused him an unspecified injury when Plaintiff was slammed into the open door and back of a police cruiser . . . . Although a close question, without additional factual content, the alleged conduct does not satisfy the exacting standard required for an IIED claim under Vermont law"). The Court therefore concludes Plaintiff has not alleged facts that rise to the high standard for a successful intentional infliction of emotional distress claim. **As such the Court grants summary judgment on Jeremie's intentional infliction of emotional distress claim.**

Sergeant Bellavance also moves for summary judgment on Plaintiff's gross negligence claim. To prove gross negligence Plaintiff must demonstrate that "1)defendants owed a legal duty to protect plaintiff from an unreasonable risk of harm; 2)defendants breached that duty; 3)defendants' conduct was the proximate cause of plaintiffs' injuries; and 4) plaintiffs suffered actual damage." *Knight v. Rower*, 742 A.2d 1237, 1242 (Vt. 1999). Gross negligence, however, is "more than an error of judgment," rather it is a failure to exercise "even a slight degree of care." *See Kennery v. State*, 38 A.3d 35, 64 (Vt. 2011) (quotation marks omitted) (quoting *Hardingham v. United Counseling Serv. Of Bennington Cnty.*, 672 A.2d 480, 482 (Vt. 1995)).

This Court previously found that a police department's use of force policy could create a duty of care. *See MacLeod v. Town of Brattleboro*, No. 5:10-CV-286, 2012 WL 5949787, at *10 (D. Vt. Nov. 28, 2012) (holding that a police department's use of force policy around the use of tasers could create a governmental duty, because while the policy was formulated with the goal of protecting the general public, "it is specifically directed to police encounters with certain members of the public"). This Court also noted that a use of force policy could create a governmental duty because the threat of physical harm in use of force incidents warrants guidance around these policies, and because a plaintiff could reasonably rely on these policies. *Id.*

Here, as in *MacLeod,* the use of force policy and its specified expectations and limitations could create a governmental duty upon which Defendants owed Plaintiff a duty from unreasonable risk of harm. *See id.* at *9 ("The question of whether 'a duty exists upon which liability may be claimed is a matter of law to be decided by the [c]ourt.'")(citing *Edson v. Barre Supervisory Union No. 61*, 933 A.2d 200, 203(Vt. 2007)). This conclusion draws on the fact that the use of force policy, while written for the public at large, is directed at a subset of citizens who have encounters with the police. Furthermore, the use of force policy can be understood as a mechanism through which the Burlington Police Department protects police officers

as well as citizens from harm by creating expectations around
police-citizen interactions. Finally, a plaintiff could
reasonably rely on these guidelines. The Burlington Police
Department publishes and updates these guidelines and holds them
out as a public document. Therefore, like in *MacLeod*, the Court
concludes that Plaintiffs have made a preliminary showing that
the use of force policy in this case creates a duty.

The question as to whether Defendants breached that duty
hinges on the reasonableness of Sergeant Bellavance's actions.
"Gross negligence is ordinarily a question of fact for the jury,
and an allegation of gross negligence may be dismissed by the
court only if reasonable minds cannot differ." *Kennery,* 38 A.3d
at 64 (citing *Kane v. Lamothe*, 936 A.2d 1303, 1309 (Vt. 2007)).
"Each case turns almost entirely on its own peculiar factual
situation." *Langdon-Davies v. Stalbird*, 163 A.2d 873, 874-75
(Vt. 1960); *see also Garafano v. Neshobe Beach Club, Inc.*, 238
A.2d 70, 76 (Vt. 1967) (noting that questions around breach of
care are "questions of fact . . . clearly for resolution by the
jury"). As discussed above, the factual basis for the
reasonableness of Sergeant Bellavance's actions is disputed.
**Therefore, summary judgment on Jeremie's state law gross**
**negligence claim against Sergeant Bellavance is denied.**

**B. Qualified Immunity Under Vermont State Law**

Finally, Defendants move to dismiss Plaintiff's state law claims under Vermont's qualified immunity doctrine. In Vermont, "lower-level government employees are immune from tort liability when they perform discretionary acts in good faith during the course of their employment and within the scope of their authority." *Hudson v. Town of E. Montpelier*, 638 A.2d 561, 564 (Vt. 1994). A determination of good faith is made based on the federal qualified immunity standard by asking "whether the Defendants' conduct violated clearly established rights . . . of which a reasonable person would have known." *Crowell v. Kirkpatrick*, 667 F. Supp. 2d 391, 417 (D. Vt. 2009). Because the Court has declined to grant qualified immunity to Sergeant Bellavance on the Fourth Amendment claim due to disputed questions of fact, those same disputed questions of fact preclude applying qualified immunity to Plaintiff's remaining state law claims of assault, battery and gross negligence.

## C. Albin's State Law Claims

Sergeant Bellavance and Officer Campbell also move for summary judgment on Albin's state law claims. The same reasons that the court used to grant summary judgment for Albin's Fourth Amendment claim on the basis of qualified immunity also exist here. **Because the Court granted summary judgment on Albin's Fourth Amendment Claim based on qualified immunity, the Court grants summary judgment on Albin's state law claims of battery,**

38

assault, intentional infliction of emotional distress and gross negligence against Sergeant Bellavance and Campbell on that same basis.

## IV. Supervisory Liability Claims

### A. Brandon Del Pozo

In their motion for summary judgment, Defendants argue that Plaintiffs have not demonstrated Del Pozo's personal involvement in any of the alleged injuries in this case, and that he is entitled to summary judgment. Historically, the Second Circuit's decision in *Colon v. Coughlin* governed supervisory liability. *See* 58 F. 3d 865 (2d Cir. 1995). Under *Colon*, supervisory liability could be demonstrated by showing that:

> 1) the defendant participated directly in the alleged constitutional violation, 2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, 3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, 4) the defendant was grossly negligent in supervising subordinates who committed wrongful acts, or 5) the defendant exhibited deliberate indifference to the rights of [persons] by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 873 (quoting *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)). In *Ashcroft v. Iqbal*, the Supreme Court held that in supervisory liability cases, a plaintiff must prove that "each government-official defendant, through the official's own actions, has violated the Constitution." 556

U.S. 662, 676 (2009). *Iqbal* thus called the *Colon* factors into question. *See Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012) ("*Iqbal* has . . . engendered conflict within our Circuit about the continuing vitality of supervisory liability test set forth in *Colon* . . . .").

Recently, in *Tangreti v. Bachmann*, the Second Circuit clarified that a constitutional "violation must be established against the supervisory official directly." 983 F.3d 609, 618 (2020). While "the factors necessary to establish a [Section 1983] violation will vary with the constitutional provision at issue," *see id.* (citing *Iqbal*, 556 U.S. at 676), in *Tangreti* the Second Circuit held that to successfully plead an Eighth Amendment claim, a plaintiff must show that "conditions of confinement . . . pose an unreasonable risk of serious harm to their current or future health, and . . . that the defendant acted with deliberate indifference." *Id.* at 618-19 (quotation marks and citations omitted). Deliberate indifference means "the official must know[]of and disregard[] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Id.* (quoting *Vega v. Semple,* 963 F.3d 259, 272 (2d Cir. 2020)) (quotation marks omitted).

The extent to which *Iqbal* heightened the requirements of pleading other constitutional violations remains somewhat unresolved. *See Lombardo v. Graham*, 807 F. App'x 120, 124 n.1 (2d Cir. 2020) (acknowledging that "*Iqbal* may have heightened the requirements of supervisory liability" but declining to say to what extent). Nonetheless, while a supervisor cannot be found liable alone "by reason of . . . [his] supervision of others who committed the violation," *Tangreti*, 983 F.3d at 619, it seemingly remains possible for a policy maker to be held liable for their creation or continuance of an unconstitutional policy or custom. *See Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010)(holding that post-*Iqbal*, "§ 1983 [still] allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy" which results in a violation of constitutional rights). To be held liable as a policymaker, a plaintiff must demonstrate that the defendant had the requisite *mens rea*, specifically that "the supervisor had subjective knowledge of a substantial risk of serious harm to a [person] and disregarded it." *Tangreti*, 983 F.3d at 616. "The focus is on what the *superviso*r did or what they caused to be done, the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable." *Id.* at 618 (quotation marks omitted). One court recently

concluded that "[r]eading *Tangreti* and . . . other decisions
together . . . a senior prison official can still be held liable
for his role in creating a policy . . . but . . . only if the
pleadings or record evidence 'permit the inference that [he] had
subjective knowledge of the risk of the sexual abuse inflicted
on [plaintiffs] and that [he] decided to disregard that risk.'"
*Stone #1 v. Annucci*, No. 20-CV-1326 (RA), 2021 WL 4463033, at *9
(S.D.N.Y. Sept. 28, 2021)(citing *Tangreti*, 983 F.3d at 619).

Based on the current summary judgment record and viewing
the facts in a light most favorable to the Plaintiffs, a
reasonable factfinder could conclude that Mr. Del Pozo knew
about the disparate use of force against Black citizens and
failed to act. For example, the Burlington Police Department
published a use of force report which analyzed data from 2012 to
2018. *See* Pls. Ex. 34. That report concluded that 20.9% of use
of force incidents were against Black people, a significantly
higher percentage than the number of Black residents in
Burlington (Plaintiffs also submit census data estimating the
Black population of Burlington at 5.7% in 2019; *see* Pls. Ex.
35). *See* Pls. Ex. 34. Furthermore, while use of force incidents
as a whole decreased from 2012-2018, the percentage of incidents
of force against Black individuals increased over this time from
~17% in 2012 to ~25% in 2018. Del Pozo clearly was aware of the
report's findings as he attested in his deposition that "as the

42

Chief of Police . . . [he] was responsible for approving that report." *See Mabior Jok v. City of Burlington, et al.,* Case No. 2:19-cv-70, ECF No. 214-68 at 33:6-9.[5]

In 2017, Jay Diaz, a staff attorney from the Vermont Civil Liberties Union, wrote a letter to Mr. Del Pozo pointing out that "[BPD] officers have arrested and threatened multiple Burlingtonians, virtually all boys or men of color, in retaliation for their speech protected by the First Amendment to the United States Constitution . . . ." Diaz went on to cite multiple incidents where "all people of color, were each charged with disorderly conduct. .. [and] none of the accused used violence, force, or clear threats. Regardless of the appropriateness of their statements, they do not fit the definition of disorderly conduct." *See* Pls. Ex. 26 at 2. The letter concluded that the "arrests in these cases demonstrate a troubling pattern of Burlington police unlawfully retaliating in violation of individuals' First Amendment rights . . . " and that "[o]fficers have a range of options available to them to avoid such confrontations, including de-escalation tactics." *Id.* at 3. The letter also detailed an incident where Burlington police officers asked a group of men of color to leave the area

---

[5] Both parties in the *Jok* and *Meli* cases have admitted Brandon Del Pozo's deposition. However, the parties have admitted different excerpts. This order will therefore reference both records.

on Main Street outside of Nectar's Music for no apparent reason. *Id.* at 1. When one of the men answered that "I know my rights" and "fuck you" to the police officers, one officer said to another, "[i]f he keeps going, I'll fucking knock his ass out." *See id.* The officers proceeded to take that man to the ground, pepper spray and arrest him, leaving him with lacerations on his hands, legs and neck. *Id.* at 2. In his deposition, Del Pozo acknowledged that he remembered receiving the letter from the ACLU. *See* Pls. Ex. 19 at 54:21. Despite this notice, Del Pozo does not remember having specific conversations with the police officers under his supervision about "their threats to knock someone out." *Id.* at 58:15-20.

Furthermore, Del Pozo supervised several officers whose traffic stop patterns and use of force patterns arguably raised concerns. A Burlington Police Department's Criminal Data Analyst, Nancy Stetson, wrote in an email to Del Pozo that the Department conducted 24 vehicle searches in 2018, 12 of which were performed on Black people; nine of those 12 were conducted by Officer Corrow, an officer named in another excessive force case against the Burlington Police Department. *See Jok,* Case No. 2:19-cv-70, ECF No. 214-31.[6] Furthermore, Del Pozo was aware of

---

[6] Both parties in the *Jok* and *Meli* cases have admitted use of force data as well as references to Nancy Stetson's analysis of that data. However, the parties have admitted different excerpts. This order will therefore reference both records.

this disparity. Former Deputy Chief of Police Janine Wright
testified in her deposition that she remembers having a
conversation with Del Pozo regarding his concerns with the
number of Black people Officer Corrow had pulled over. *See Jok,*
Case No. 2:19-cv-70, ECF No. 214-33 at 92:3-94:7.[7] In another
email to Del Pozo, Stetson noted that from the period from July
1, 2016 to the end of March 2019, Officer Campbell, a named
defendant in this lawsuit, was in the top 75% of officers for
use of force incidents. *See Jok,* Case No. 2:19-cv-70, ECF No.
214-27.[8] Finally, Plaintiff's Expert Nader Hashim analyzed
Sergeant Bellavance's use of force data finding that 25% of
Bellavance's use of force incidents were committed against Black
people (above average as compared to 20% for the Burlington
Police Department as a whole). *See* Pls. Ex. 47.

Additionally, University of Vermont Professor Stephanie
Seguino and Cornell University Professor Nancy Brooks conducted
a statewide analysis of racial disparities in traffic policing
titled "Driving While Black and Brown in Vermont." *See Jok,* Case

---

[7] Both parties in the *Jok* and *Meli* cases have admitted Janine
Wright's deposition. However, the parties have admitted
different excerpts. This order will therefore reference both
records.
[8] Both parties in the *Jok* and *Meli* cases have admitted Brandon Del
Pozo's deposition. However, the parties have admitted different
excerpts. This order will therefore reference both records.

No. 2:19-cv-70, ECF No. 214-51.[9] Published in 2017, the report estimated that "Black drivers are stopped at [a] rate that is between 161% and 193% of their population share." *Id.* at 29. The report also concluded that the Black arrest rate statewide is almost double the White arrest rate. *Id.*  Plaintiffs submit that these findings are relevant to disparities in the use of force. Plaintiff's expert Seguino stated in her deposition that "based on the analysis that we have done of traffic stop data that demonstrate ... differential treatment based on race, it is a reasonable assumption that if there are biased behaviors in traffic stops, there are biased behaviors in other interactions with citizens." *See* Pls Ex. 36 at 55:6-12. Furthermore Seguino and Brooks acknowledged in their study that "[t]o the extent we observe disparities in traffic stops, we may be able to identify racial disparities and bias that are not so easy to discern with events that occur less frequently or for which bias is difficult to measure empirically." *See* Pls. Ex. 37 at 8 (noting that "[a]s an example, there are wide racial disparities in use of force and arrests rates, but these events occur much less frequently than traffic stops.") See *id.* at 8 n.7.

---

[9] Both parties in the *Jok* and *Meli* cases have submitted Professor Seguino's findings. However, the parties have admitted different excerpts. This order will therefore reference both records.

A reasonable factfinder could conclude that given the use of force data, traffic stop data, and the ACLU letter, Mr. Del Pozo was on notice of the disproportionate use of force against Black citizens within the police department he supervised and despite that notice, he failed to take action. A reasonable jury could further conclude that notice coupled with inaction constitutes deliberate indifference. **For the reasons stated above, the summary judgment on Plaintiff's supervisory liability claim against Mr. Del Pozo is denied.**

Plaintiff also brings a state law negligent supervision claim against Mr. Del Pozo. When pleading a negligent supervision claim, a plaintiff must demonstrate an employer's knowledge of misconduct, that the misconduct was foreseeable, that the employer owed a duty to plaintiff, and that that duty was breached. *Rudavsky v. City of South Burlington*, No. 2:18-CV-25, 2018 WL 4639096, at *6-7 (D. Vt. Sept. 27, 2018). The questions of knowledge and foreseeability "should be viewed in the context of the alleged pattern, practice, and/or policy with respect to the use of excessive force" because "if, as alleged, [the police] had a practice of overlooking or downplaying incidents of excessive force . . . then it was foreseeable that officers would be inclined to use such force without fear of discipline." *See id.* at *6 (declining to dismiss a negligent supervision claim against the city of Burlington for alleged

47

excessive force by its officers). Taking the facts in the light most favorable to plaintiff, a factfinder could conclude that Defendant Del Pozo knew about misconduct, that misconduct was foreseeable, and that he owed a duty to Plaintiff. *See also id.* at *7 (noting that "when a detainee has been taken into custody and is, for example, handcuffed, he is unable to defend himself from attack and is owed a duty of protection by his custodian"). Because the Court has denied summary judgment for the supervisory liability claim against Mr. Del Pozo, the Court also denies summary judgment on the negligent supervision claim for the reasons stated above. *See LaFaso v. LaFaso*, 223 A.2d 814, 819 (Vt. 1966); *see also Garafano v. Neshobe Beach Club, Inc.*, 238 A.2d 70, 76 (Vt. 1967) (noting that questions around breach of care are "questions of fact . . . clearly for resolution by the jury"). **The City's motion for summary judgment on the negligent supervision claim is therefore denied.**

## V. *Monell* Claims against Defendant City of Burlington

Under *Monell*, a municipality can be held liable in cases where the injury suffered by a plaintiff arises from the municipality's customs or policies." *Monell v. Dep't of Social Services*, 436 U.S. 658, 694 (1978). This "policy, custom or practice" can be met in four ways. *See Webster v. City of New York*, 333 F. Supp. 2d 184, 205. (S.D.N.Y 2004). Plaintiff can demonstrate (1) evidence of a formal policy adopted by the

municipality, *see Monell*, 436 U.S. at 690; (2) actions taken by policy makers that caused the constitutional deprivation, *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986); (3) a practice "so permanent and well settled as to constitute a custom or usage . . . ," *see Monell*, 436 U.S. at 690-91 (quotation marks omitted); *see also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985) (noting that "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy"); and (4) failure to train and supervise by policy makers which constitutes deliberate indifference to the constitutional rights of those affected. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

### A. Fourteenth Amendment *Monell* Claim

Plaintiffs allege that the Burlington Police Department allowed a pattern of behavior to develop involving the unlawful use of force against minorities in violation of the Fourteenth Amendment. A successful claim under the Fourteenth Amendment requires a plaintiff to allege that a state actor intentionally discriminated on the basis of race. *See Brown v. City of Oneonta, New York*, 221 F.3d 329, 337 (2d Cir. 2000). A plaintiff can allege this by identifying a policy that "expressly classifies persons on the basis of race," *see Hayden v. County*

*of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999), or a plaintiff can identify a facially neutral policy that is motivated by racial animus or applied in an intentionally discriminatory manner. *See Yick Wo v. Hopkins*, 118 U.S. 356 (1986); *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977). While Plaintiffs point to a disparate impact on Black citizens in the use of force, they have supplied no evidence that the city's policy was intentionally discriminatory or that it was motivated by racial animus. For support, Plaintiffs cite social media posts to purportedly show that leadership within the Burlington Police Department was motivated by racial animus. While this evidence may call into question the actions of certain individuals, it does not allege that the Department applied its use of force policy in an intentionally discriminatory manner. **Summary judgment on Plaintiff's Fourteenth Amendment claim against the City of Burlington is therefore granted.**

### B. Fourth Amendment *Monell* Claim

Plaintiffs allege that Defendant City of Burlington failed to properly train, supervise, and discipline its officers resulting in violation of Plaintiffs' Fourth Amendment rights. In their motion for summary judgment, Defendants argue that Plaintiffs *Monell* claim against the City of Burlington fails because Plaintiffs have failed to identify specific deficiencies

50

in the City's training that led to their alleged constitutional

violations. Furthermore, Defendants argue that Plaintiffs have

not produced any evidence suggesting the City of Burlington was

deliberately indifferent to a pattern of Fourth Amendment

violations.

First, a reasonable factfinder could conclude that the City

of Burlington's decision to hire Brandon Del Pozo as Chief of

Police despite being aware of his academic writing suggests

deliberate indifference. In that published writing, Del Pozo

"argu[es] against [the] quick dismissal of racial profiling,

writing that in some instances it is a legal, ethical and useful

tool for policing," and comments on the criminality of Black

offenders:

> NCVS data, [where] individual blacks are 50 times more
> likely to commit crimes against whites than vice-versa;
> groups of blacks are up to 250 times as likely to do so.
> In fact, NCVS data suggests that blacks are responsible
> for 90% of all violent interracial crime. What this
> implies is that in racially-mixed situations, blacks
> account for the vast majority of violent, interracial
> crime. A further implication is that if the police are
> patrolling such areas populated by a mix of white and
> black citizens, the sub-group of blacks among them
> contains significantly more criminals.

Pls. Ex. 49 at 14.  Furthermore, a reasonable factfinder could

conclude that Former Chief of Police Brandon Del Pozo's remarks,

coupled with use of force data and traffic stop data discussed

above, that suggests Black citizens were disparately impacted by

Burlington police interactions, as well as a ACLU letter notifying the city of a "disturbing pattern … [of] arresting and charging men of color with disorderly conduct," all put Defendant City of Burlington on notice of constitutional violations.

Specifically, under *Monell's* second factor, a reasonable factfinder could conclude that injuries suffered by Plaintiffs in this case were a result of inadequate or non-existent policies around racial bias training and the higher use of force and arrest rates against Black citizens. Under *Monell's* third factor, a reasonable fact finder could conclude that the City of Burlington permitted a widespread practice of permitting higher use of force against Black citizens, as evidenced by use of force reports, the ACLU letter addressed to the Burlington Police Department, other lawsuits, news articles and academic studies. Finally, under *Monell's* fourth factor, a reasonable factfinder could conclude that the City of Burlington failed to provide adequate training and supervision of subordinates on racial bias and racial animus, to the extent that it amounted to deliberate indifference to the rights of those who can into contact with the municipal employees. In sum, a reasonable factfinder could also conclude that Defendant City of Burlington's failure to remedy these violations, and its failure

to train and supervise its employees, amounted to deliberate indifference to Plaintiff's Fourth Amendment rights.

In the alternative, Defendants argue that Plaintiff's *Monell* claim should be denied because "Plaintiff has not identified a witness qualified to provide expert opinion testimony regarding the statistics compiled by Defendant Burlington." *See* ECF No. 133 at 30 (referring to the use of force statistics provided by the Burlington Police Department). In doing so, Defendants cite *Floyd v. City of New York*, 959 F. Supp. 2d 540, 577 (S.D.N.Y. 2013) as a case "discussing reasons witness was not qualified to testify as expert regarding statistics." *See* ECF No. 133 at 30. Defendants' argument fails for several reasons.

First, while Defendants argue that Plaintiff has not identified an expert to interpret the statistics it seeks to introduce, Defendants do not directly claim that expert testimony is required to determine whether a custom or policy meets the *Monell* standard.  Furthermore, while the case upon which Defendants rely, *Floyd v. City of New York,* does include an extensive discussion of expert methodology and testimony in that case, it does not hold that expert testimony is necessary for a *Monell* claim.

Second, and most importantly, case law suggests that a plaintiff can survive summary judgment without having identified

an expert if they have other evidence to support their claim. While the Second Circuit has not definitively said whether an expert is required to survive summary judgment on a *Monell* claim, it has upheld several *Monell* claim verdicts without the use of expert testimony related to city or department policies. *See Sorlucco v. New York City Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992) (holding that contrary to the district court's evaluation, plaintiff had introduced "sufficient evidence from which the jury could reasonably infer an unconstitutional NYPD practice of sex discrimination); *Fiacco v. City of Rensselaer, N.Y.*, 783 F.2d 319, 331 (2d Cir. 1986) ("Drawing all reasonable inferences in favor of [plaintiff], the jury could rationally have concluded that during the two years prior to [plaintiff's] arrest, the City defendants' response to complaints of use of excessive force by City police officers was uninterested and superficial. . . . reflecting an indifference by the City to the use of excessive force."); *see also Okin v. Vill. of Cornwall-On-Hudson Police Dep't,* 577 F.3d 415, 441 (2d Cir. 2009) (denying summary judgment on municipal liability claims without mentioning expert testimony). In all those cases, the Court either denied summary judgment or upheld a verdict without mention of the use of expert testimony.

In *Sorlucco*, for example, the plaintiff submitted a statistical study prepared by the New York Police Department

54

("NYPD") tracking disciplinary action taken against probation officers as evidence. *See Sorlucco*, 971 F.2d at 871. The court in that case disagreed with the district court's conclusion that the study was statistically insignificant. *Id.* at 872. In doing so, it reasoned that the plaintiff "presented ample facts concerning her treatment at the hands of her superiors from which the jury, in conjunction with the statistical evidence, could have reasonably inferred that there was a custom of sex bias operating within the NYPD" and it "believe[d] that . . . [plaintiff's] evidence concerning her 'personal experiences with the [NYPD] brought the cold numbers convincingly to light,' ... at least to the extent where the jury could rationally reach the result it d*id*." *Id.* at 872. This conclusion was made all without any mention of expert testimony.

In another case, *Lucente v. County of Suffolk*, six female inmates claimed that the county had a custom or practice of ignoring or inadequately addressing a correction officer's sexual misconduct with inmates. 980 F.3d 284, 288 (2d Cir. 2020). The district court granted summary judgment for the county and the Second Circuit reversed, holding that plaintiff's evidence raised genuine issues of fact as to whether the county had a custom or practice of ignoring a correctional officer's sexual misconduct with inmates. *Id.* In reaching this conclusion, that court did not analyze the requirement for expert testimony

per se, but no expert testimony was mentioned at all. This
suggests that expert testimony was not part of the case, and
that it was not required for plaintiff to survive summary
judgment.

Finally, in *Okin*, relying on "more than a dozen contacts
between . . . [plaintiff] and the Village" the Court noted that,
"[plaintiff's] claim of municipal liability . . . focused on the
Village's alleged failure-to-train, is fairly construed to
articulate a claim that the Village had a custom whereby it
acquiesced in unconstitutional conduct by its officers" and that
"[t]hese incidents suggest a consistent pattern of failing to
adequately respond to . . . [plaintiff's] complaints, to
implement the New York mandatory arrest statute, to interview
the alleged abuser, or to file domestic incident reports, a
pattern which may have encouraged further violence." *Okin*, 577
F.3d at 439-440 (citing *Vann v. City of New York,* 72 F.3d 1040,
1049 (2d Cir. 1995) ("[D]eliberate indifference may be inferred
if . . . complaints are followed by no meaningful attempt on the
part of the municipality to investigate or to forestall further
incidents.").

Additionally, several other circuits have upheld *Monell*
claims without expert testimony. *See e.g.*, *Watson v. City of
Kansas City, Kan.*, 857 F.2d 690, 696 (10th Cir. 1988) (allowing
the admission of arrest rate statistics with no mention of an

expert interpretation because "[w]hen all of the plaintiff's evidence is considered, it is sufficient, if believed, to support a jury finding that the City and Police Department followed a policy or custom of affording less protection to victims of domestic violence than to victims of nondomestic attacks"). Furthermore, the Third Circuit has definitively said that expert testimony is not necessarily required to uphold a *Monell* verdict. *See Beck v. City of Pittsburgh*, 89 F.3d 966, 973-75 (3d Cir. 1996) (holding that because a jury could infer from numerous complaints that the police department knew of an officer's violence and failed to investigate those claims, it allowed a custom of excessive force and the district court erred in granting summary judgment; the court further held that expert testimony was not required to show deficiencies in procedures so as to hold the city liable). In *Beck*, the court reasoned that "[a]s for drawing inferences from the evidence regarding the adequacy of the investigatory process . . . '[t]o require expert testimony to prove this fact is ridiculous. It is not beyond the ken of an average juror to assess what a reasonable municipal policymaker would have done with the information in this case'"). *Id.* at 975-76.

Taken together, these holdings suggest that expert testimony is not required to survive summary judgment on a *Monell* Claim. The Court therefore rejects Defendants' argument

that Plaintiff's claim should be dismissed for want of expert
testimony. **Summary judgment on the Fourth Amendment *Monell* Claim
against Defendant City of Burlington is thus denied.**

## VI.  Municipal Liability State Law Claims

### A. Vicarious Liability for Negligence

While Plaintiffs concede that their § 42 U.S.C 1983 claims
against Sergeant Bellavance preclude the City of Burlington from
respondeat superior liability, *see Monell v. Dep't Soc. Servs.*,
436 U.S. 658, 691 (1978), they argue that Jeremie's state law
supervisory liability claims face no such restriction. Under
Vermont state law, an employer can be held liable for torts
committed by its employees when done in the scope of employment.
*See Brueckner v. Norwich Univ.,* 730 A.2d 1086, 1090 (Vt. 1999).
Conduct is considered to be within the scope of employment when
"(a) it is of the kind the servant is employed to perform; (b)
it occurs substantially within the authorized time and space
limits; (c) it is actuated, at least in part, by a purpose to
serve the master; and (d) in a case in which the force is
intentionally used by the servant against another, it is not
unexpectable by the master." Restatement (Second) of Agency §
228(1) (1958). Furthermore, the claims against the City of
Burlington are derivative of the claims against Sergeant
Bellavance. Therefore, because we have declined to dismiss the
claims against Sergeant Bellavance, we also decline to dismiss

58

the claims against the City. See *Winfield v. State*, 779 A.2d
649, 653 (Vt. 2001) ("Plaintiff's claims against the State are
derivative of the tort claims against the individual defendants.
Since we have held that the conduct complained of . . . failed
to violate any established rights to which plaintiff was
entitled, we discern no basis for the claims against the
State."). Because we have established that the claims against
Sergeant Bellavance are not entitled to summary judgment, the
same is true of the supervisory liability claim against the
City. *See id.* **Therefore, summary judgment on Jeremie's claim
against Defendant City of Burlington for its supervision of
Sergeant Bellavance is denied. For the same reasons, summary
judgment is granted for Charlie and Albin's claims against the
City of Burlington for its supervision of Officer Campbell and
Sergeant Bellavance.**

### B. Negligent Supervision

Plaintiffs also argue that Defendant City of Burlington's
failure to train, supervise, discipline and sanction officers
amounts to gross negligence in violation of Vermont State law.
As discussed above, when pleading a negligent supervision claim,
a plaintiff must demonstrate employer's knowledge of misconduct,
that the misconduct was foreseeable, that the employer owed a
duty to plaintiff, and that that duty was breached. *Rudavsky*,
2018 WL 4639096, at *6-7 (D. Vt. Sept. 27, 2018). Taking the

59

facts in a light most favorable to Plaintiff, a factfinder could conclude that City of Burlington knew about misconduct, that misconduct was foreseeable, and that it owed a duty to plaintiff. The Court uses the same reasoning here that it did when denying summary judgment on the negligent supervision claim against Mr. Del Pozo. **The City's motion for summary judgment on the negligent supervision claim thus denied.**

### Conclusion

For the reasons set forth above, Defendants' Motion for Summary Judgment on Jeremie's claims is **GRANTED** as to his IIED claim and **DENIED** as to the remainder of his claims. Defendants' Motion for Summary Judgment on Albin's claims is **GRANTED**. Defendants' Motion for Summary Judgment on Charlie's claims is **GRANTED**. Defendants' Motion for Summary Judgment on Plaintiffs' *Monell* claims is **GRANTED** as to the 14th Amendment claim and **DENIED** as to the 4th Amendment claim. Defendants' Motion for Summary Judgment on Plaintiffs' supervisory liability claims against Defendant Del Pozo and the City is **DENIED.**

DATED at Burlington, in the District of Vermont, this 14th day of February, 2022.

/s/ William K. Sessions III
William K. Sessions III
U.S. District Court Judge